## COMMONWEALTH vs. PHILIP ANTHES.

In this commonwealth, before the St. of 1855, c. 152, the jury, in criminal trials, had no rightful power to determine questions of law involved in the issue, against the instructions of the court. THOMAS, J. dissenting.

Since the St. of 1855, c. 152, which declares that, " in all trials for criminal offences, it shall be the duty of the jury to try, according to established forms and principles of law, all cases which shall be committed to them, and, after having received the instructions of the court, to decide at their discretion, by a general verdict, both the fact and the law involved in the issue, or to return a special verdict at their election," the jury have no rightful power to determine questions of law involved in the issue, against the instructions of the court. DEWEY and THOMAS, JJ. dissenting.

Whether the St. of 1855, c. 152, purports to allow to the jury, in criminal trials, the rightful power to determine, against the instructions of the court, questions of law involved in the issue, quære. By DEWEY, BIGELOW and THOMAS, JJ. that it does. By SHAW, C. J., METCALF and MERRICK, JJ. that it does not.

The legislature cannot, consistently with the Constitution of the Commonwealth, confer on the jury, in criminal trials, the rightful power to determine questions of law involved in the issue, against the instructions of the court; even by a statute which also provides that the jury shall try the cases according to established forms and principles of law, and that the court shall superintend the course of the trials, decide upon the admission and rejection of evidence, and upon all questions of law raised during the trials, and upon collateral and incidental proceedings, and charge the jury, and allow bills of exception, and may grant a new trial in cases of conviction. By SHAW, C. J., METCALF, BIGELOW and MERRICK, JJ. Contra, DEWEY and THOMAS, JJ.

INDICTMENT on St. 1855, c. 215, § 17, for being a common seller of spirituous and intoxicating liquors. Trial and convic-

16*

tion in the court of common pleas at October term 1855 before *Sanger*, J., who signed the following bill of exceptions :

" During the trial the defendant's counsel moved the court to instruct the jury :

" 1st. That the law is unconstitutional and void.

" 2d. That the jury have a right to judge of the constitutionality of the law.

" 3d. That if the jury do so judge, and have a reasonable doubt whether the law be constitutional or not, they must acquit the prisoner.

" The court declined so to instruct the jury, but did instruct them, that the law is constitutional, and that under the provisions of chapter 152 of the statutes of 1855, entitled an act concerning the duties and rights of jurors, although the jury might judge of the meaning of a law, they had not the right to judge of its constitutionality."

*J. W. May*, for the defendant.

*J. M. Keith*, (District Attorney,) for the Commonwealth. ·

The decision was made at Boston on the 27th of August 1857.

Shaw, C. J.   This case was argued more than a year ago, and the points arising thereon were ably discussed ; but as the principal point considered came up in various parts of the Commonwealth, it has been postponed from time to time, in order to give it the fullest consideration.

These exceptions directly raise the questions, both of the construction and constitutionality of the jury law of 1855 ; and if it were necessary to consider these questions, so far only as might be necessary rightly to decide the present case, a very brief view only would seem to be necessary.   But as there are now many more cases before us, presenting these and other questions of like kind on the same subject, a more enlarged and extended consideration of this statute seems to be required, embracing the two questions : what is the true meaning and interpretation of this statute ; and whether it is constitutional.

The statute is short, and to the following effect : " In all trials for criminal offences, it shall be the duty of the jury to try, according to established forms and principles of law, all causes

which shall be committed to them, and, after having received the instructions of the court, to decide at their discretion, by a general verdict, both the fact and the law involved in the issue, or to find a special verdict, at their election ; but it shall be the duty of the court to superintend the course of the trials, to decide upon the admission and rejection of evidence, and upon all questions of law raised during the trials, and upon collateral and incidental proceedings, and also to charge the jury, and to allow bills of exception ; and the court may grant a new trial in cases of conviction." *St.* 1855, *c.* 152.

In the case before us, the court instructed the jury, that the jury, by force of this statute, had a right to judge of the meaning of a law, but had no right to judge of its constitutionality. Taking both these clauses together, and considering that the subject was the construction of a statute, it is plain, we think, that the court intended to instruct the jury, that they had a just and full authority to exercise their own reason and judgment, in determining the interpretation of a legislative enactment, and though the court directed them as matter of law, that the enactment bore one meaning and interpretation, and the jury clearly understood such direction, and perceived its application to the facts of the case before them, they might lawfully and rightfully reconsider the reasons and grounds of such decision and come to an opposite decision, on such interpretation, as matter of law. Taking such to be the import and legal effect of the learned judge's ruling, my own opinion is, that it was incorrect in point of law, and that the statute will not bear that construction. On the contrary, it seems to me that this was a declaratory act, making no substantial change in the law regulating the relative rights and functions of the court and of the jury, in the trial of criminal cases.

On the other point, the court, in this particular case, charged the jury, that, though they might judge of the meaning of a legislative act, they had no authority to judge of its constitutionality. Yet in some other cases, courts, under like circumstances, have charged the jury, that they were judges of the constitutionality of any legislative enactment; and therefore if

the court judged, and directed the jury, that the act was consti-
tutional, the jury, fully understanding that direction, might, in
the exercise of their own reason and judgment, consider the con-
stitutionality of the enactment, upon all the grounds and princi-
ples of constitutional law, in the same way in which a superior
court of acknowledged appellate jurisdiction would revise the
decision of an inferior court in matter of law, and might pro-
nounce it constitutional; or *vice versa*, if the court directed them
that it was constitutional, they might pronounce it unconstitu-
tional.

And we really can perceive no ground, upon which the power
of the jury to decide on the question of constitutionality can be
distinguished, in principle, from the power to decide on any
other question of law, involved in the verdict. Many criminal
prosecutions are of such a nature, that they impose a duty on
some department of the judicial authority to decide, whether a
particular legislative enactment be consistent with or repugnant
to the Constitution of the Commonwealth, or of the United
States, and it must be definitively adjudicated, on true and just
principles, by either judge or jury.

To comprehend this the better, let us analyze a criminal pros-
ecution, and the judgment therein, and inquire of what ingre-
dients it is composed. We are to bear in mind that the pur-
pose, the ultimate end and object of criminal jurisprudence, is
the better to secure the peace and good order of society, and to
ensure the security of public and private rights, by the pun-
ishment of crimes and offences, and all violations of law.
These may be either *mala in se*, such crimes and offences as are
in themselves wrong and injurious; or *mala prohibita*, things not
wrong in themselves, but prohibited and made punishable by
law, because they tend to injurious consequences, and their pre-
vention is judged necessary by the lawmaking power, to secure
the peace and good order of a well regulated community.

Every criminal prosecution therefore necessarily involves two
very distinct inquiries: First. Is there such a law as it is alleged
in the indictment that the person accused has violated? Second.
Has the person accused done the act or acts, which it is alleged
in the indictment he has done?

If both of these are found in the affirmative, according to the Constitution and law, the accused is guilty; if either be negatived, if there is no such law, or if the accused has not done the acts charged in that indictment, he is not guilty.

It will be at once perceived that, in resolving the first question, the inquiry divides itself into several distinct inquiries, namely:

1. Supposing the prosecution to be on a statute, is there any such legislative enactment?

2. Does the statute, when expounded according to the rules of law, according to the true intent of the legislature, bear the meaning and interpretation put upon it in the indictment, so as to bring the acts charged against the defendant within the true meaning of the statute, and render him liable to the penalty of it?

3. Is it within the constitutional power of the legislature, as fixed and limited by the Constitution of the Commonwealth; or does it exceed those limits, so that, although it has all the forms of a law, it wants the vital energy, which can only be breathed into it by the Constitution, and therefore is inoperative and void?

4. Does it contravene any law of the United States, made within the scope of their limited powers, as given by the Constitution of the United States, and which, when so made, is the supreme law of the land, and so must exercise a controlling power over all state legislatures? If it does contravene any such law of the United States, it is inoperative and void. ·

Perhaps the matter may be illustrated by supposing a familiar example of a prosecution under a provision of statute, for some act indifferent in itself, but to which a penalty is annexed by statute, say an indictment for selling lottery tickets. The whole proceeding assumes the form of a syllogism, of which the law is the major proposition, the fact the minor, and the judgment the conclusion, and is of something like the following form:

First. There is a law prohibiting the sale of lottery tickets;

Second. John Styles has sold a lottery ticket, within the time, &c., at, &c.;

Conclusion. Therefore John Styles has violated the law, and become subject to the penalty.

Upon the first, or major, it may be denied that there was such a law in force. This is commonly answered by reading the clause from the statute. But it may be still insisted, that this enactment was made after the act done, which is relied on as a violation, or that its operation was suspended or repealed by a subsequent enactment, or that it had expired by its own limitation, before trial. These are not difficult questions, but they are pure questions of law.

Then comes the question of interpretation, What was the true intent and meaning of the statute? In the case supposed, evidence is offered, tending to prove that, at the time fixed, John Styles and a number of his charitably disposed friends had a poor neighbor, an artist in great distress for money. He had a picture worth one hundred dollars, but no one there could afford to purchase it, though all were disposed to help him. They agreed to contribute five dollars each, and make what is called a raffle. They requested John Styles to take the money, give each a bit of paper with a number marked on it, from 1 to 20; and it was then determined by lot, in some agreed manner, which contributor should have it. It is contended in defence, that this was not a lottery, that such pieces of paper were not tickets, and such distribution of them not a sale; that the whole was a pure act of charity, and not a violation of the statute; all of which is of course controverted by the prosecutor.

Here then may arise questions of law of the utmost difficulty and delicacy, and turning upon that abstruse but most necessary duty of judges, the exposition of statutes, involving inquiries respecting the ordinary and technical meaning of the language used, the preamble and other provisions of the same statute, all other statutes and parts of statutes on the same subject, the previous state of the common law, and the mischief intended to be suppressed, in order to ascertain the true intent and meaning of the legislature in the specific enactment in question.

Here then are questions of law, of the utmost importance to the security and happiness of all those who live or come within

the territorial limits of the government for which such statute was made, questions the solution of which requires not only wisdom and integrity, but the most thorough experience and skill in .aw as a science. It is of the highest importance, not only that there should be a true and correct interpretation of the statute, so that those, and those only, whom the legislature intended to restrain and punish, may be brought under its operation; but also that such operation shall be equal and uniform over all those who are subject to the same government. And perhaps the latter consideration is, if possible, more important than the former. If the intention of the legislature, in a particular enactment, after a full investigation by the highest judicial authority of the same government, should happen to be misunderstood or mistaken, it will be easy for the legislature, by a subsequent act, to correct it, by a more explicit provision. But if the same penal statute could so operate as to subject one person to punishment, and exempt another, equally liable, and this in its ordinary operation, it would bring the law into discredit, work great injustice, and defeat the purposes both of legislation and of the administration of justice.

But the trial may also draw in question the constitutionality of the statute on which the prosecution rests. Continuing the supposed case, let us further suppose that the defendant offers evidence to prove that the tickets he sold were those, and those only, of a lottery authorized by a previous act of the legislature, and justifies under that authority. He might here contend, with what effect I will not say, that such former license was a grant, a contract by the government with its grantees; that although it had altered its policy, and that upon the highest considerations of public benefit, and although it had in terms, by this very act, repealed all prior laws granting licenses for lotteries, yet it was beyond its constitutional power to revoke a grant, and annul a contract; that such repealing act, in terms ever so explicit, was itself void, and therefore that the defendant had violated no existing law, and must be acquitted.

Or suppose the defendant should insist, and the evidence on both sides should plainly prove, that the defendant sold lottery

tickets in a national lottery, authorized by the congress of the United States, and should insist that a lottery was a well known financial expedient for raising revenue, resorted to by many sovereign states, and, until recently, by the government of Great Britain, and many of the states of the Union; that, under the authority vested in the government of the United States to raise revenue, they had a constitutional power to establish a lottery and license the sale of tickets in every state of the Union, even against its consent, and notwithstanding any state act prohibiting it; and justify under that authority.

It is very obvious to any one, that the discussion and decision of this question must necessarily involve that great class of difficult problems, as to the limited powers of the United States government, vested therein by the Constitution, and the supremacy of all legislative acts passed by congress within the just scope of these limited powers. These are questions which have tasked the minds of the most eminent American statesmen and jurists, from the adoption of the Federal Constitution to the present time.

These last questions can arise in American courts only, where, in each state, the written constitution of such state and that of the United States form a part of the written law, controlling to a certain extent all other laws, and must, like all other existing rules of law, be taken notice of and applied by the judiciary department. No such question ever could arise in England; and therefore English jurisprudence affords no precedent and hardly any analogy to aid us, in the solution of these questions.

Such then is the nature and character of a criminal prosecution in every system of jurisprudence; it necessarily embraces two questions: first, whether there is such a law as the indictment assumes; and next, whether the accused has violated it.

The one requires the most accurate and complete knowledge both of the written and unwritten law, and, in America, an equally thorough and practical knowledge of constitutional law, as they are to be derived from records and adjudged cases, ancient and modern, and books of acknowledged authority in

which they are embodied, from statutes, and from the constitu-
tions of the United States and the state in which the case arises,
and adjudications thereon.

The other is a question of fact, to be decided by competent
evidence, to be weighed and considered in reference to its
tendency to prove the acts charged to have been done by the
defendant; and the question is, are these facts true? The adju-
dication of this question, in addition to the integrity and impar-
tiality requisite to the decision of both, requires experience,
practical knowledge of affairs, and a quick and accurate discern-
ment of the motives, reasons and intentions by which persons in
various circumstances are actuated.

Both are of an important character, upon the correct decision
of which in every case the security for the rights of life, liberty
and property essentially depends; but they are essentially distinct
in their nature, requiring different modes of training and prep-
aration.

Now, to whom do the Constitution and laws of this common-
wealth entrust the ultimate and final duty and power of adjudi-
cating on these distinct questions? I use the term " adjudicate,"
in preference to others nearly synonymous, and often used as
synonymous; and to make the question more plain, to whom
do the Constitution and law ultimately entrust the power to ex-
ercise that reason and judgment, acting upon all the appropriate
premises, and thereupon to draw the conclusion whether there is
such a law, when its existence, interpretation or validity is
drawn in question?

And in like manner, to whom do the Constitution and law
rightfully entrust the power to adjudicate and decide upon the
appropriate evidence, whether the facts charged in the indict-
ment are true, when their truth is controverted?

In my opinion, it is for the judges to adjudicate, (using the
term in the sense above stated,) to adjudicate finally, upon the
whole question of law, and for a jury to adjudicate upon the
whole question of fact.

It appears to me that this is the true theory and fundamental
principle of the common law, both in its civil and criminal de-

partments. I speak not now of trials by impeachment, of cases of equity or admiralty or ecclesiastical jurisdiction, or of trials by court martial; but of civil and criminal proceedings, conducted according to the course of the common law. And the general theory and principle above stated, in common law proceedings, are considered applicable as well to criminal as to civil trials, subject to some modification, hereafter stated.

In the first place, wherever the form of the proceeding is such that the facts are not controverted, and the only question which is controverted is a question of law, the judges, in the first instance or ultimately, decide the case, and render a judgment, without the intervention of a jury, in criminal as well as civil cases. On a motion to quash an indictment, on a demurrer, which, though not frequent in a criminal case, is still legal and admissible, on a plea of *nolo contendere*, and on a motion in arrest of judgment, in all which cases the facts are not controverted, the judgment is rendered exclusively by the court.

Again, when the facts of any case are adjudicated and decided by a jury, such adjudication affects the particular case only, and forms no precedent for any other, although it may depend on precisely the same evidence.

But, on the contrary, an adjudication in matter of law, especially if made by a court of last resort, is regarded as a precedent, and affords a rule of decision for the same court and for all other courts, judges and magistrates, very strong, if not absolutely binding and conclusive, in all subsequent cases depending on the same facts, and involving the same principles. I say, "if not absolutely binding and conclusive," because we may suppose a case where it is subject to a slight modification. Such an adjudication of a court of last resort, made on full deliberation, is held, by the fundamental principles of the common law, binding upon all judges of inferior and subordinate courts, and upon all single judges. But the same court who made it may not be considered as absolutely bound; because, though such an adjudication is of great weight, and will only be reconsidered with great caution, yet if, after a first decision of a new and important question of municipal or constitutional law, it is shown to

the court that the subject has not been sufficiently examined, or that some weighty consideration has been omitted to be presented, or has been overlooked or mistaken by the court, a re-argument of such question of law may be allowed, in the same case, or in another case involving the same question. This very allowance of a second, and, in possible cases, a third argument, indicates that feeling of heavy responsibility felt by such courts, to come to a right conclusion upon a question of law, and not to come to it till all the means have been used to enable them to make it right, where such decision is to stand as a fixed rule for all like cases, until the law is altered by the legislature; and this responsibility is greatly increased where the question is a constitutional one, and a change in the results of such decision cannot be effected by any legislation. And where such an adjudication is finally settled, it becomes a binding and conclusive rule of decision to the same court, to the several judges thereof when sitting and acting separately, and to all subordinate courts, judges and magistrates. Such adjudications upon a statute become as essential a part of the law to which such statute relates as the statute itself.

It is this fundamental principle of the common law, that the adjudications of the highest tribunal, or court of last resort, in matters of law, shall stand as rules of law in all similar cases, which makes it necessary, in every system of jurisprudence following the common law, that all decisions in matters of law, made by subordinate courts and judges, shall in some mode be reëxaminable, and in some form be brought before the court of last resort, to one tribunal, one judicial mind and judgment, whether vested in one or many persons, in order that the rules of law may be uniform throughout the whole extent of territory subject to the same government, that all the inhabitants alike owning allegiance shall stand equal before the law, alike entitled to its protection and benefits, and alike amenable and punishable for its violation.

It is from the consideration that the adjudications of courts of last resort, in matters of law, are regarded as rules of law, and that it is necessary to the freedom of the citizen, and the

peace and good order of society, that all rules of law should be certain and uniform, that the necessity has been felt of establishing one court, and one only, of last resort, be it called superior court, supreme judicial court, or court of errors. The business of the community, the great pressure upon one court, and the necessary delays consequent thereon, would often render it highly expedient for a prosperous and affluent community to establish two, three or more supreme courts, that all its judicial business might be done speedily and promptly. But it is obvious, were such courts established, one court might decide one way upon the construction or constitutionality of a statute, and another another way; and one accused party might be punished, and another acquitted, under the operation of one and the same statute, and having done precisely the same acts. The reason therefore for not establishing more than one court of last resort, which would in many respects be highly convenient and desirable, is not the expense, not any difficulty in finding men for judges, equally wise, learned, honest and industrious, and equally capable of expounding the laws; but the difficulty, not to say the impossibility, of maintaining more than one such court, consistently with that uniformity and certainty in the application of the laws and the administration of justice, which are of paramount importance. This consideration was felt and acted upon in framing the Constitution of the United States, adopted a few years after that of our own state, and perhaps under a somewhat more matured experience, in providing, in terms, that " the judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the congress may from time to time order and establish." Art. 3, § 1. Notwithstanding the vast extent of territory, the great number of interests, the variety and importance of the subjects, commercial, political and personal, which would fall under the operation of this judicial power, there could be but one supreme court, though the subordinate courts might be unlimited in number. The reason is obvious; otherwise, there could be no certainty and uniformity in the administration and exercise of that judicial power.

Commonwealth *v.* Anthes.

If it be asked why such adjudication of a court of last resort should have such effect, the answer, it appears to me, is this: It is necessary to the security of public and private rights, to the liberty of the subject, and the safety of the community, that there be an authoritative exposition, as well as an authoritative enactment of all laws, especially all penal laws; that, as far as possible, they should be declared, published and known; and the adjudications of the highest court, or court of last resort, are conclusive, because there is no power under the Constitution and laws, by which they can be reversed or altered.

That there should be somewhere entrusted an authority to exercise reason and judgment, and adjudicate finally upon the questions both of law and fact, is too obvious to require argument. *Interest reipublicæ, ut finis sit litium.* There must be an end, a termination, a conclusion of litigation; otherwise, suits civil and criminal would not only be ruinous, but fruitless. If, because on the first trial there may have been error by which a party has suffered, therefore there must be a second, the same may be said of the second, which would require a third, and so on. It is certainly true that, in the decision of either the fact or the law, or both, there may be error; but this is only saying that to err is human, and however the law or fact is decided, it must be by the minds and judgment of men, whether the same or different. And this must continue, because there is no other mode. It is the lot of humanity, and we must yield to its inexorable demands. The law therefore must entrust the power, and make it the duty of one person or set of persons to adjudicate finally upon questions of law and fact; and when so done, all parties must acquiesce and abide by it as conclusive, because it is the nearest approximation to correctness which can be reached.

If then it be asked why the adjudications of juries are not as conclusive and binding as those of judges, I say that, in my opinion, they are. They are conclusive of the facts of that case; they cannot have the same conclusive character, as precedents, rules for the decision of other cases, not because they are not entitled to the same consideration as definitive, but from the nature of

17*

the questions decided. The facts proved in one case to the satisfaction of a jury, from which they have found that one man did a criminal act, with a certain criminal intent, and in violation of the same law, have no tendency to aid another jury in deciding, on the evidence before them, that similar acts were done by another man at another time and place.

But where the law has entrusted to juries the power and authority to exercise their own reason and judgment, and adjudicate on questions of fact, it would be as absurd to say that they can be punishable for a false verdict, as to say that a judge, who has determined a question of law according to the best powers of his mind, can be punished for a false judgment. But there were times in the earlier periods of the law, when juries might be subject to an attaint, and were liable to be tried before a double jury, upon whose verdict the former verdict might be set aside and reversed, and the jurors themselves subjected to punishment. This, like many anomalies of the like kind, such as the *peine forte et dure* for refusing to plead, punishing a party on trial for challenging peremptorily more than twenty jurors, instead of simply overruling his challenge, and many other practices of like kind, show how little the true nature and principle of jury trial, in its perfection, were understood, and afford us a caution against attributing much weight to rules and precedents of such a period. But these abuses and anomalies have long since passed away, and both in Great Britain and in this country the principle of jury trial is well understood.

And in my judgment the true glory and excellence of the trial by jury is this; that the power of deciding fact and law is wisely divided ; that the authority to decide questions of law is placed in a body well qualified, by a suitable course of training, to decide all questions of law; and another body, well qualified for the duty, is charged with deciding all questions of fact, definitively ; and whilst each, within its own sphere, performs the duty entrusted to it, such a trial affords the best possible security for a safe administration of justice and the security of public and private rights.

Nor do we consider that this great fundamental principle of

the common law respecting jury trial, which gives to this depart-
ment of jurisprudence that symmetry, consistency and perfec-
tion, by which it commands the favor and admiration of all
friends of free institutions, and of civil liberty secured by law, is
controlled or limited in its just and legitimate operation by the
acknowledged rule, that, in all criminal prosecutions, the jury
have the power of deciding, that is, of embracing and declaring
the law as well as the fact, by a general verdict. This results
from a few well established rules of law and practice, incident
to the trial of a criminal case.

In criminal cases, special pleading, technically admissible, has
never been practised, and all trials therefore, in which both law
and fact are controverted, are had upon a general plea of " not
guilty ; " and the result is a conviction, if both the law and the
fact are found against the accused, or an acquittal, if either is
found in his favor. Both must be tried, that is, submitted fully
and freely to the consideration of the appropriate tribunal ap-
pointed by law, to exercise its reason and judgment without
control or restraint; but the result is one single response to both
questions—" Is there such a law ? "—" Has the defendant done
the acts charged?"—and that response is expressed, and entered
and placed on the record in due form, " guilty " or " not guilty."
We are then to look at the means by which these two questions
are resolved by a single answer; through what intellectual pro-
cesses, of reason and judgment, the elements of these two dis-
tinct questions must pass, in order to reach this one required
result. Assuming it as the theory and fundamental principle of
the common law, that the judge is to adjudicate the law, and
the jury the fact, it follows that the mind of the judge should
act freely and fully, and within the scope of its proper authority
and province, finally and exclusively decide upon the question
of law, and that the mind of the jury should act freely and
fully, and within the scope of its authority and duty, defini-
tively and exclusively, in deciding the truth of the fact; and
this is to be done in one of two modes. By the one, the jury,
in the exercise of their exclusive right, find the facts in detail,
which can only be done in the form of a special verdict; and

then the court, in the exercise of their judgment, determine whether in law, under all the aspects in which these facts can be placed, they do bring the accused within the penal provisions, and the result is declared by the court, "guilty" or "not guilty." But how is it if the more plain, intelligible and usual course is adopted, by the return of a general verdict? Do not the same ingredients, in another form, enter into and compose the elements from which the same result is drawn? The judge directs the jury in all matters of law, at each step of the trial, as questions arise, and ultimately in its application to the facts of the case, if proved by the evidence submitted to them. As the judge cannot foresee how the jury will find the facts, until they have retired to consider of their verdict, these directions are of necessity hypothetical; if they find certain facts proved, he directs them that the law affixes to them a certain character, and so upon each material point of law, and then if they find so, the accused is guilty, if otherwise, not guilty, and that they are to return their verdict accordingly.

The law presumes that every man will do his duty, more especially every man invested with a high power in the administration of justice; it will presume that both judges and jurors have done their duty. If they have, and it is within the province of the jury to adjudicate on the question of fact, and of the judge to adjudicate on the question of law, the general verdict of "guilty," or "not guilty," is as full and complete an answer to the compound question of law and fact, each adjudged by its appropriate organ, as the like conviction pronounced by the judge after a special verdict. As the law presumes that each has done its appropriate duty, in case of a special verdict, the court cannot question the truth of any fact expressly found by the jury, or assume the existence and truth of any fact not so found, or draw any inferences of fact not drawn by the jury and expressed in the verdict. By parity of reasoning, the law presumes, in case of a general verdict, that the jury have understood and conformed to the directions of the judge in matters of law, and so, as before said, the general verdict in the latter is as full a response to the compound question. The difference

Commonwealth *v.* Anthes.

is, that, in the former case, of a general verdict, the law, coming authoritatively from the rightful source, is first stated to the jury for their government, is assumed to have its legitimate and proper effect, is by them combined with their own conclusive findings in matters of fact on the evidence, and so the combined result is effectually embodied in their verdict of conviction or acquittal.

But in another aspect this difference is most essential, and attended with important consequences. In the one case, that part of the respective duties of the court, composed of judge and jury, which is done by the one, and which by the other, appears on the record; but although the law presumes that the rules of law, as adjudicated by the judge, have been received, understood, acted upon, and truly reported upon and embodied in the verdict, yet this does not appear upon the record. And there is no legal or practicable mode by which it can be brought to the knowledge of any other court or tribunal or revising judicial power whatever, that the jury did not adopt the rules of law as stated by the judge. The jury cannot be legally inquired of, what were the rules of law adopted by them; nor if the judge could be called on, in any legal or practicable mode, to declare what rules of law he did prescribe for the direction of the jury, could it be made to appear that the jury did follow them. As the jury have full power and rightful authority to adjudge the fact, and as on a general verdict it cannot appear that they did not act on right principles in matters of law, it cannot appear that their verdict, so far as they acted upon their own reason and judgment, was not limited to the decision of the questions of fact, it cannot be known that they exceeded the limits of their power, and therefore such general verdict, embodying and placing on record the law as well as the fact, stands as conclusive. No writ of error lies in such case, for no error in law appears on the face of the judgment.

Hence it is, that where the real controversy is upon the law, and the facts are not substantially controverted, the universal practice has been to agree that a special verdict be returned, or an agreed statement of facts, with liberty for either party to

turn such agreement into a special verdict. In that case, the question of law distinctly appears on the record of the judgment, upon which a writ of error lies, by which it may be carried to the tribunal of last resort for the decision of the law.

And in my opinion the rightful power of the judge to adjudicate the law, as it is conceded to be that of the jury to judge of the fact, is not controverted, but confirmed as the ancient and fundamental rule of the common law, by the doctrine of attaint. We are inclined to think that an attaint was not held to lie in a criminal case, though there may be some conflict amongst ancient writers upon that point. But it is immaterial, because the fundamental general principle, that the judge is to answer to the question of law, and the jury to the fact, applies as well to criminal as civil cases. We may therefore safely resort to the proceedings in civil cases, to ascertain the general principle applicable to both. The attaint originated in barbarous times, when the true principles of jurisprudence were not well understood; originally, it was a proceeding before a double jury against the first jury, for finding a false verdict; it not only, if successful, reversed the judgment and restored the party against whom the first verdict was returned to all his lost rights, but subjected the jury to deprivation of all civil and social rights, and operated as a forfeiture of all the property of the jurors, required that each juror's wife and children be turned out of his house, and his house prostrated. The charge was, that they had given a false verdict. This was mitigated by the advance of civilization, and has been since completely exploded. But it appears to me that the existence of such a law, and the means adopted to mitigate it, by statute and by judicial proceeding, all tend to show where, by the ancient law, the ultimate power to decide the law and the fact respectively and ultimately resided.

I assume that the responsibility for declaring the law rested on the judge, and for the fact only on the jury. In law, in duty and in conscience, they were only to answer for the fact; but if they would return a general verdict, they made the whole verdict, law and fact, their own; if they mistook the law, yet

the party against whom they mistook it was deprived of his writ of error, his only remedy to reverse the judgment was by attaint, and therefore the jury should not be heard to say, that they ought not to be held liable for the whole verdict, if false. And here it is necessary to avoid being misled by the use of such terms as " responsibility," ambiguous in meaning and in idea. It is one thing to be responsible, that is, to be liable over to another party, liable in damages, liable to punishment, liable to censure and animadversion; it is another thing to be responsible to God and his own conscience for speaking the truth, for doing his duty, though not liable over to any earthly power, by way of censure, punishment or damages. It is to be borne in mind that it is in this last sense that responsibility is to be now understood.

Regarding these burdensome penal consequences of a .false verdict, the question must naturally arise, to what extent are the jury responsible for a false verdict? If it is for the truth of the fact only, then the anxiety of jurors must be, how shall that liability be limited to its proper sphere. We have seen, that if they return a general verdict, the whole appears to be fact, there are no means of distinguishing, and they are liable to an attaint if any part is false. It is obvious therefore that this responsibility will be limited to its proper sphere, the truth of the fact, by returning the facts specially, and leaving the law to be decided by this court. To enable them to do so seems, amongst other things, to have been the precise object of one of the clauses of *St.* Westm. 2, *c.* 30.

The clause in the statute, as translated by Lord Coke, is as follows: " And also it is ordained, that the justices assigned to take assizes shall not compel the jurors to say precisely whether it be disseizin or not, so that they do show the truth of the deed, and require aid of the justices. But if they of their own head will say that it is disseizin, their verdict shall be admitted, at their own peril." Lord Coke, after several other remarks, says " In the end it hath been resolved, that in all actions, real, personal and mixed, and upon all issues joined, general or special, the jury might find the special matter of fact pertinent and tend-

ing only to the issue joined, and thereupon pray the discretion of the court for the law ; " and then he adds, as a statement of the law, of his own knowledge, " and this the jurors might do at the common law, not only in cases between party and party, but also in pleas of the crown at the king's suit." 2 Inst. 422, 425.

Lord Coke has elsewhere stated that the term "discretion of the court" means the legal discretion, in other words the judicial determination of the law, as follows : " ' *And prayed the discretion of the justices.*' That is to say, they, having declared the special matter, pray the discretion of the justices; which is as much as to say, as that they would discern what the law adjudgeth thereupon, whether for the demandant, or for the tenant; for as, by the authority of Littleton, *discretio est discernere per legem quid sit justum,* that is, to discern by the right line of law, and not by the crooked cord of private opinion." Co. Lit. 227 *b*.

To come back then to the statute, the natural interpretation seems to be this; that, as it is the province assigned to the jury to find the facts, and the province of the judges to determine the law arising thereon, if the jury will confine themselves to their proper sphere, and give a true verdict upon the facts only, they perform their whole duty, they are in no peril of an attaint or any other injurious consequence, and the purpose of this statute was to confirm the common law authorizing them so to do ; and though the statute speaks only of actions between party and party, yet the principle of the common law, of which this statute is declaratory, extends to pleas of the crown, or criminal prosecutions. It presupposes the principle as well understood, that juries are not responsible for a right decision on the law, because the law does not entrust them with that authority, but has entrusted it with the judges. If they were entrusted with the duty of deciding the law, in opposition to that of the judge, a right to overrule and revise his adjudication, they could not divest themselves of the obligation to do it rightly, any more by a special, than by a general verdict.

It would seem to be an extraordinary proposition, and I do not know that I have seen it suggested, that the law vested the

authority in jurors in all cases definitively to decide the law, but left it to their discretion, in each case, to exercise that power, or refuse to exercise it altogether, and by their act vest it in the judges. Had this been the intent, would there have been such an elaborate provision for revising every question of law, and bringing it to the test of one standard, which Lord Coke calls " the right line of law," in contradistinction to " the crooked cord of private opinion," without any possibility of reëxamining a rule of law, and ascertaining its correctness, when definitively settled by the jury. But upon the theory that they are not judges of the law, but only incidentally declare the law, by a general verdict, the provisions of the act, as well as the rule of the common law, are entirely intelligible. The reason why the jurors are liable to an attaint when they return a general verdict, is, that they go beyond the line of their duty, beyond the province assigned them, and put the whole upon the footing of matter of fact.

So in another passage, Lord Coke, commenting on Littleton's speaking of a verdict of twelve men, says, " *Veredictum, quasi dictum veritatis,* as *judicium est quasi juris dictum;* " that is, *vere dictum,* a true declaration, or declaration of the truth, as *judicium, juris dictum,* a statement of the law; and then adds the familiar Latin maxim, " *Et sicut ad quæstionem juris non respondent juratores, sed judices; sic ad quæstionem facti non respondent judices, sed juratores.* For jurors are to try the fact, and the judges ought to judge according to the law that riseth upon the fact." Co. Lit. 226 *a.* And so in a subsequent page : " Although the jury, if they will take upon them the knowledge of the law, may give a general verdict, yet it is dangerous for them so to do, for if they do mistake the law, they run into the danger of an attaint; therefore to find the special matter is the safest way, where the case is doubtful." Co. Lit. 228 *a.* And so in *Rawlyns's case,* 4 Co. 53, Lord Coke has this sentence : " In such case the jury ought, if they will not find the special matter, and leave it to the judgment of the law, to find ' at their peril ' according to law."

Whence then are these remarkable phrases ! In the *St.* of

Westm. 2, for instance: " But if they [the jury] *of their own head* will say," " their verdict shall be admitted, *at their own peril.*" Is it not equivalent to this, if they officiously go beyond the line of their province and duty ? So in Co. Lit., last cited : " Although the jury, if they will take upon them the knowledge of the law, may give a general verdict, yet it is dangerous for them so to do, for if they do mistake the law," &c. Why dangerous, except it is going beyond their duty, and beyond the trust reposed in them ? And if they are authorized to decide the law finally, why do they incur danger of punishment? Is a judge ever punishable for a mistake of the law ? and would it not be inconsistent with all just notions, to say that, where the law has entrusted to any functionary a power finally to judge upon any question affecting the rights of the public or of parties, and he has executed that duty and passed his honest judgment, he shall be punished for a mistake? The reason, then, why a juror is punishable for a mistake of the law, is because he has exceeded his authority in a manner which affects the rights of others injuriously. The necessary conclusion is, that, regarded as the law was at the period in question, the jurors had no legitimate power to adjudicate questions of law, but for that part of every trial judges alone were entrusted with the power of adjudicating the law. The authorities may be almost indefinitely multiplied. Without referring to them, I would refer to Hargrave's extremely instructive note to Co. Lit. 155, for a summing up of them.

We are then to consider upon what grounds it is held, that, although, in a criminal case, a verdict of " guilty" or " not guilty," which embodies and declares both the fact and law, is held conclusive ; yet, though they thus have a power, they have not a right to decide, that is, to adjudicate, on both law and evidence. From the foregoing discussion, which might be greatly enlarged by many pertinent and strong reasons, I think a satisfactory answer may be drawn. It is conceded on all hands, that, upon a general issue, the only issue upon which the merits of a criminal charge can be tried, the jury have an unquestionable right to return a general verdict. And although

they may return a special verdict, they are not bound to do so. And as a special verdict implies a knowledge of the forms of law and practice, and requires great nicety to be correctly framed, it is very seldom in practice that a jury *ex mero motu* resort to this expedient.

The difference between a civil and criminal case always was, that in the latter, where the judgment was on a verdict of " not guilty," no writ of error would lie, even where it was alleged that error in the judgment appeared on the face of the record. So in more modern times, when exceptions have taken the place of other modes of revising a judgment, exceptions are not allowed in favor of the king, nor in this commonwealth in favor of the prosecutor, though they are in favor of the accused. *Commonwealth* v. *Cummings*, 3 Cush. 212. The reason is obvious; the effect of allowing and sustaining a bill of exceptions, where the accused is acquitted, would not be to reverse the decision of a jury, and enable the court to render such judgment as they should have rendered, but only to set aside the verdict and order a new trial. And in case of acquittal, the law does not allow a new trial, proceeding in this respect on the ground of several humane and equitable principles, wisely adopted by the law in favor of life, and in tenderness to those accused of crimes and offences.

No person shall be twice put in jeopardy for the same cause. Having been put on his trial, and stood for his deliverance, and been acquitted by a general verdict, it would be a violation of this humane principle to subject him to the same peril again, on the same or different evidence. If on different evidence, the injustice and inhumanity of it would be a palpable violation of the letter and spirit of the above maxim. If it were proposed to submit it to another jury upon the same evidence, it would be a violation of another admitted and just principle of criminal law, which is, that, to warrant a verdict of conviction, the facts upon which it depends must be proved beyond reasonable doubt. The case supposes the accused to have been acquitted by the first jury on certain specified evidence. There is no more ground upon which the law can repose confidence in the

integrity and discernment of one jury than of the other. All
that a second jury could do would be to say, that in their judg-
ment the accused was guilty, leaving verdict against verdict, and
so at least balanced, and doubtful.

The result of these several rules and principles is, that, in
practice, the verdict of a jury, both upon the law and the fact,
is conclusive; because, from the nature of the proceeding, there
is no judicial power by which the conclusion of law thus brought
upon the record by that verdict can be reversed, set aside or in-
quired into.

A general verdict, either of conviction or acquittal, does em-
body and declare the result of both the law and the fact, and
there is no mode of separating them on the record so as to ascer-
tain whether the jury passed their judgment on the law, or only
on the evidence. The law authorized them to adjudicate defin-
itively on the evidence; the law presumes that they acted upon
correct rules of law given them by the judge; the verdict there-
fore stands conclusive and unquestionable, in point both of law
and fact.

In a certain limited sense, therefore, it may be said that the
jury have a power and a legal right to pass upon both the
law and the fact. And this is sufficient to account for many
and most of the *dicta* in which the proposition is stated. But it
would be more accurate to state, that it is the right of the jury
to return a general verdict; this draws after it, as a necessary
consequence, that they incidentally pass upon the law. But
here again is the question, what is intended by " passing upon
the law ? " I think it is by embracing it in their verdict, and
thus bringing it upon the record, with their finding of the facts.
But does it follow that they may rightfully, and by authority of
the common law, by which all are conscientiously bound to
govern their conduct, proceed upon the same grounds and prin-
ciples in the one case as the other ?

What the jury have a right to do, and what are the grounds
and principles upon which they are in duty and conscience
bound to act and govern themselves in the exercise of that right,
are two very distinct questions. The latter is the one we have

to deal with. Suppose they have a right to find a general ver-
dict, and by that verdict to conclude the prosecutor in the matter
of law, still it is an open and very different question, whether, in
making up that verdict and thereby embracing the law, they
have the same right to exercise their own reason and judgment,
against the statement of the law by the judge, to adjudicate on the
law, as unquestionably they have on the fact. The affirmative
of this proposition is maintained by the defendant in this case,
and by others in many of the cases before us.

If I am right in the assumption that the judge is to adjudge
the law and the jury the fact only, it furnishes the answer to
this question, to what extent the jury adjudicate the law; and
it is, that they receive authoritative directions from the court,
and act in conformity with them, though by their verdict they
thus embrace the law with the fact, which they may rightfully
adjudicate. I do not intend to revise the authorities, but, in ad-
dition to those already cited, I will refer to a few, taken almost
at random.

The opinion of Chief Justice Vaughan, in 1670, in *Bushell's
case*, is of high authority. It arose on a writ of *habeas corpus*.
It appeared that Bushell and eleven other jurors, who had sat
on the trial of Penn and Mead on a charge of sedition, were
fined by the judge, and ordered to be imprisoned, as appeared
by the return on *habeas corpus* of the warrant of commitment,
for finding the defendants not guilty, as alleged in the warrant
of the judges by whom they were committed there, " against
the law of this realm of England, against full and manifest evi-
dence, and against the direction of the court in matter of law."
The imprisoned jurors were discharged, as being punished ille-
gally. The case is reported in Vaughan, 135, and 6 Howell's
State Trials, 999, and the relative powers of judge and jury in
criminal trials largely stated.

The whole case is extremely instructive; the result of the
whole is plainly this: That according to the long course of law
and practice, in trials of criminal cases, a jury cannot be pun-
ished for giving a verdict either of acquittal or conviction, on
the ground that such verdict is either against the law or against

18*

evidence. They cannot be punished for finding against law The court say that the words, in the warrant, "that the jury did acquit against the direction of the court in matter of law literally taken, and *de plano*, are insignificant and not intelligible; for no issue can be joined of matter in law, no jury can be charged with the trial of matter in law barely, no evidence ever was or can be given to a jury of what is law or not; nor no such oath can be given to or taken by a jury, to try matter in law; nor no attaint can lie for such a false oath." Vaugh. 143.

Nor can the jury be punished, because their verdict is against evidence; because it is impossible for the judge to know the evidence; it is not his province to weigh evidence, decide on the credit of witnesses, and draw inferences, and therefore on such general verdict the court cannot know that the verdict was not given upon the evidence, which it is the province of the jury alone to consider and decide, according to its influence on their own minds and judgments. The court mark the obvious distinction between the oath of a witness and that of a juror. " A witness swears but to what hath fallen under his senses. But a juryman swears to what he can infer and conclude from the testimony of such witnesses, by the act and force of his own understanding, to be the fact inquired after, which differs nothing in the reason, though much in the punishment, from what a judge, out of various cases considered by him, infers to be law in the question before him." Vaugh. 139, 142.

It may be remarked, that from the improved views of the nature of jury trial, during the two hundred years which have elapsed since the decision of Chief Justice Vaughan, the juror is now in no more danger of punishment, for giving an erroneous verdict in matter of fact, than a judge is for giving an erroneous judgment in matter of law. But his statement clearly implies that the judge, within his appropriate sphere, is to act by the force of his reason and understanding, and, by the aid of his knowledge of the law and all appropriate means, to adjudge all questions of law, and direct the jury thereon; and in like manner the jury, by the force of their reason and understanding, acting upon all the competent evidence in the case, to reason,

weigh evidence, draw inferences, and adjudge the question of fact embraced in the issue.

Again : " In these cases, the jury, and not the judge, resolve and find what the fact is. Therefore always, in discreet and lawful assistance of the jury, the judge's direction is hypothetical and upon supposition, and not positive and upon coercion, namely, If you find the fact thus, (leaving it to them what to find,) then you are to find for the plaintiff; but if you find the fact thus, then it is for the defendant." Vaugh. 144.

It is strange that the authority of Vaughan, C. J., in this case, should be cited, as it has been, to prove that a juror, in finding a general verdict, embracing law and fact, being sworn to try the issue, must find his verdict upon his own conviction and conscience, relying, in support of the proposition, upon the following words of Vaughan, C. J.: " A man cannot see by another's eye, nor hear by another's ear ; no more can a man decide and infer the thing to be resolved by another's understanding or reasoning." Vaugh. 148.

Had these words been applied to the whole issue embraced in a general verdict, as would be implied from the manner of referring to them, they would have countenanced the proposition ; but they are used expressly to illustrate the position, that the jury cannot be required implicitly to give a verdict by the dictates and authority of the judge.

I refer only to one other passage, which serves as a key to the whole judgment. He says : " That *decantatum*\* in our books, *ad quæstionem facti non respondent judices, ad quæstionem legis non respondent juratores,* literally taken, is true ; for if it be demanded, What is the fact? the judge cannot answer it; if it be asked, What is the law in the case ? the jury cannot answer it." Vaugh. 149.

The next case to which I refer is that of *Rex* v. *Oneby,* 2 Ld. Raym. 1485. It was an indictment for murder; the jury found

---

\* So called, says Mr. Hargrave, in his note on Co. Lit. 155, on account of its frequency in the books about the respective provinces of judge and jury.

a special verdict, upon which, as I understand, it was brought before the twelve judges, and the opinion was given by Lord Raymond. In the course of it he said : " But before I mention their reasons, I must lay down this proposition, which they all agreed, namely, that the court are judges of the malice, and not the jury; and that the court are also judges upon the facts found by the jury." 2 Ld. Raym. 1493. This was in 1727.

I will cite one other case, because it was before any question arose out of the controverted libel cases, and determined by a very eminent judge of great experience, Lord Hardwicke. It was on a criminal information in the nature of a *quo warranto*, to try the validity of an election to a corporate office ; and one point discussed was, whether it was to be regarded as a civil or criminal prosecution. But as the verdict was against the accused, it was considered that he had a right to move, upon the statement of the judge, that in his opinion the verdict was against the law. Lord Hardwicke said : " The thing that governs greatly in this determination is, that the point of law is not to be determined by juries ; juries have a power by law to determine matters of fact only : and it is of the greatest consequence to the law of England, and to the subject, that these powers of the judge and jury are kept distinct; that the judge determines the law, and the jury the fact; and if they ever come to be confounded, it will prove the confusion and destruction of the law of England." *The King* v. *Poole*, Cas. temp. Hardw. 28. This was in the King's Bench in 1734.

I had noted many other English cases, which, however, I must pass over without citing; but I am unwilling to forego a bare reference without quoting it, to Mr. Wynne's celebrated work, entitled Eunomus, or Dialogues concerning the Law and Constitution of England, a work of great merit and reputation, and first published about the time of the adoption of our constitution. 3 Eunomus, § 53.

I desire however to refer to one subject, that of libel, which in some quarters seems to have been regarded as settling the question, that in all criminal cases juries may rightfully adjudicate upon the law, as well as the fact; but it seems to me so

manifestly to lead to the opposite conclusion, and to involve a discussion of the true principle on which jury trial is placed by the common law, that, at the risk of appearing tedious, I wish to state it fully enough to make it intelligible.

This controversy arose in England during a period shortly preceding the American Revolution, respecting the relative powers of courts and juries, in cases of public prosecutions for libel. It arose in times of great party violence and heat, connected itself intimately with the great political contests of the time, and was conducted in the courts of justice, in parliament, and in the country, with a warmth of passion not favorable to the satisfactory determination of legal principles. But it appears to me that, whether we consider the point upon which the controversy turned, the principles assumed and admitted on all sides as the basis of the argument, or the provisions of the act of parliament, commonly known as Mr. Fox's bill, by which it was terminated, they do not impugn the great principle of the common law, that to questions of fact the jurors respond, to questions of law the judges.

Criminal prosecutions for libel might, by the common law, be by indictment or information; but in point of fact they were most usually state prosecutions, commenced by information filed by the attorney or solicitor general, *ex officio*, and most frequently for political offences, and therefore were often contested with great bitterness, the political parties actively taking sides, in favor of the crown or of the accused respectively.

The controverted question arose in this way: By the theory of the law, language, the meaning, effect and interpretation of all language is of legal construction, and must be settled as matter of law by courts. This rule applied to statutes, proclamations, treaties and other acts of state, and also to private contracts of all sorts; and this, in theory, was considered as applicable to publications charged to be libellous. But it is obvious that the same language may have a different meaning, according to the thing referred to, from existing facts or external circumstances, not apparent in the written or printed publication itself. To meet this view, the rules of pleading strictly

required that the indictment or information should set out the matter charged to be libellous, *in hæc verba.* If the words should be charged to have any peculiar meaning beyond their ordinary sense, by reason of any fact, then such fact is to be distinctly averred, with time and place, so that it may be put in issue and tried. If it was relied on that such words were written or spoken in connection with such fact or circumstance, it must be stated, in terms, that they were written or spoken " of and concerning " such facts, ordinarily styled the *colloquium,* adding in all suitable places innuendoes, pointing the meaning of the words to the particular persons or things to which it is intended to charge that they did apply.

Now the theory of those judges, who held that the jury were only to find the fact of publication, and the truth of the aver-ments, *colloquia* and innuendoes was this; that when the words of the alleged libel are exactly copied, and all the circumstances and incidents which can affect their meaning are stated on the record, inasmuch as the construction and interpretation of lan-guage, when thus explained, is for the court, the question of the legal character of such libel, whether seditious or obscene, whether it illegally slanders the living, or blackens the memory of any one deceased, would be placed on the record, and there-fore, as a question of law, would be open after verdict, on a mo-tion in arrest of judgment. Whatever might be the verdict, if the publication thus spread on the record, with its averments, is not libellous, the court must so declare it. Those who took this side of the question insisted, that if the publication was *per se* libellous, it was unlawful, and the innocent intent and purpose of the publisher afforded no excuse, and if libellous and illegal, the malicious intent was an inference of law. Those reasoners therefore maintained that a criminal prosecution for libel was peculiar, and distinguishable from all others in this, that, by the form of proceeding, the whole matter was spread upon the record ; that, when the fact of publication and the truth of the averments and innuendoes were established, the whole question of guilty or not, as in case of a special verdict, was a question of law ; and they therefore held that it was right to instruct the

jury that, if they found these facts true, they ought to return a verdict of guilty, without passing their judgment upon the question of malicious intent or guilty purpose. These views, it was maintained, were supported by a series of respectable authorities, nearly or quite uniform, from the English Revolution to the time of this controversy.

On the contrary, it was maintained by the popular party, that such a view of the law of libel tended to discourage and repress all free and manly discussion of public affairs, and destroy the just freedom of the press; that whether a publication was libellous or not, depended upon the justifiable motive, or mischievous intent, with which it was written; that if it was fairly intended to expose and correct the abuses of bad government, or wickedly to weaken and impair the acts of good government, that these were questions of fact, depending on many facts of a public nature, which could not be brought upon the record; and that therefore the question, whether it was unlawful, malicious and wicked, false in fact, and not written with good motives and for justifiable ends, might even depend on the purpose and character of the whole publication, of which the parts selected as libellous are usually extracts only; that these are all facts bearing upon the general question of guilt, and therefore like other facts, on which the guilt of a party accused of crime depends, were to be found by the jury. Some respectable authorities could be adduced to show that such had, at times, been the course of eminent judges in instructing the jury.

The first case, I believe, in which this was made the subject of much controversy was that of *Rex* v. *Woodfall*, 5 Bur. 2661, in the year 1770, which was an information for the publication of a seditious libel, being one of the letters of Junius. When we consider that Lord Mansfield was the judge, and remember the vehement attacks made by that popular, eloquent and un-scrupulous writer on the judicial character of Lord Mansfield, we cannot be surprised to find that the question should assume an air of some bitterness. Upon the trial, the jury found the defendant guilty of printing and publishing *only*. The verdict was afterwards set aside, on the ground that it was ambiguous

and uncertain; but the judge charged the jury, and this again was affirmed by the whole court after argument, that " whether the paper was in law a libel was a question of law upon the face of the record;" and again; "'Guilty of printing and publishing,' when there is no other charge, is 'guilty;' for nothing more is to be found by the jury." 5 Bur. 2666, 2668. That the court intended thus to state and declare upon the theory above stated is manifest from the whole tenor of the case. The court say, in terms, that if the jury "meant to say 'they did not find it a libel,' or 'did not find the epithets,' [that is, wickedly, maliciously, &c.,] or 'did not find any express malicious intent,' it would not affect the verdict; because *none of these things* were to be proved or found either way." 5 Bur. 2669. And they say this had long been the settled rule of practice.

But the great struggle on this subject took place in the case of *The King* v. *Dean of St. Asaph*, reported most fully in 3 T. R. 428, *note.* The case was tried before Buller, J., who charged, in summing up, that there were two facts for the consideration of the jury, namely, the fact of the publication, and the truth of the innuendoes. It came before the full court, and was argued in a masterly manner for the defendant by Mr. Erskine, in one of his celebrated speeches. The opinion of the court was given by Lord Mansfield, who again affirmed the correctness of the ruling, and upon the same grounds, and he cited many authorities to show that this had long been the established practice.

Lord Kenyon, a few years later, directed the jury in the same terms, in *The King* v. *Withers*, 3 T. R. 428.

Thus stood the law, as declared and administered in the highest courts of Great Britain, until this remarkable controversy was terminated by an act of parliament, *St.* 32 G. 3, c. 60, which settled the law for that government. After reciting that doubts had arisen, it declared and enacted that on every such trial, the jury may give a general verdict of guilty or not guilty upon the whole matter put in issue upon the indictment or information, and shall not be required or directed by the court or judge to find the defendant guilty, merely on proof of the publication by the defendant of the paper charged to be a

libel, and of the sense ascribed to the same in the indictment or information; that, on every such trial, the court or judge shall, according to their or his discretion, give their or his opinion and directions to the jury on the matter in issue, in like manner as in other criminal cases; that nothing in the act shall be construed to prevent the jury from finding a special verdict, at their discretion, as in other criminal cases; and in case the jury shall find the defendant guilty, it shall be lawful for him to move in arrest of judgment, on such ground and in such manner as he might have done before the passing of the act.

It will be borne in mind that the leading adjudications above cited were made, and this act of parliament was passed, after the separation of the United States from Great Britain, so that they have no authority here as positive law; and they are referred to only as historical evidence, showing what the ancient common law of England was when it became the common law of Massachusetts and the other colonies of English origin.

It appears to me that the manner in which this controversy was conducted, and the ancient authorities which it brought to light, have a significant and direct application in support of the proposition I am endeavoring to maintain. Both parties acted on the assumption that, by the common law, the juries answer to questions of fact, and judges to those of law, and when all the facts appear on the record, it is for the court only to decide and pronounce the law. It is frequently stated in the course of the controversy, as by Lord Mansfield in *The King* v. *Dean of St. Asaph*, 3 T. R. 431, *note*, that this is a universal maxim, without exception. But those who favored the power of the crown and high prerogative insisted, that when the alleged libel was placed on record, as the meaning and interpretation of language is for the court, the question whether guilty or not was a question of law. Lord Mansfield said, in the case cited · " It is almost peculiar to the form of a prosecution for a libel, that the question of law remains entirely open for the court upon the record, and that the jury cannot decide it against the defendant; so that a general verdict, that the defendant is guilty, is equivalent to a special verdict in other cases. It finds all

which belongs to the jury to find, and finds nothing as to the question of law." He also says, that when the offence depends upon an indifferent act, done with a criminal intent, the intent must be averred and proved as a fact, like other facts but that libel is an exception. 3 T. R. 429, *note.*

On the contrary, it was maintained by those opposed to the high prerogative of the crown, and more in sympathy with the popular writers who were the parties subject to crown prosecutions, for writings which they maintained to be innocent, but which were charged as treasonable or seditious, intended to bring the government into hatred and contempt, and promote illegal insurrection or forcible opposition, that a writing in itself is simply innocent or indifferent; that, if it tend to disturb the public peace, the criminality consists entirely in the malicious intent and injurious purpose with which it is written or published; that, after a paper charged to be libellous is set out in precise words, with all the averments, *colloquia* and innuendoes with which the most skilful pleader can draw up an information, the question of malicious intent and injurious purpose depends upon many facts, some of a public and some of a private nature; that the criminal intent and purpose, therefore, which alone can make the publication illegal and punishable, is a question of fact, and of course for the jury, subject only to this difference in matter of form, that the judge directs the jury in matter of law before they return their verdict, the law relying upon the intelligence and sense of duty of the jury, to apply the law to the facts they may find, and declare the result by a general verdict. These considerations certainly have great weight, and seem to render the case of libel analogous to other criminal cases, where guilty intent and purpose appear to be of the essence of the offence; and upon this ground the statute ultimately placed it.

Now to apply this to the point respecting which we are inquiring, the relative powers and functions of the court and the jury. Both parties assume the existence and force of the rule we are attempting to establish, as the ancient rule of the common law. The court and high prerogative party say, judges

answer to the law and jurors to the fact; the question of guilty or not, in the peculiar form of a criminal prosecution for libel, after the jury have found the fact of publication and truth of the innuendoes, is a question of law, and therefore must be declared exclusively by the court. The popular party, assuming the same major proposition, say, the question of guilty or not is a question of fact, and can be found only by the jury.

It appears to me therefore, as I stated in the outset, that, considering the course of the controversy, the earnestness and ability with which every point was contested, and the thorough examination of the ancient authorities, this concurrence of views on the point in question affords strong proof that, up to the period of our separation from England, the fundamental definition of trials by jury depended on the universal maxim, without an exception, " *ad quæstionem facti respondent juratores, ad quæstionem juris respondent judices.*"

Perhaps, instead of this revision of the authorities upon the general subject, it would have been sufficient, for the purpose of this inquiry, to refer to the case of *Commonwealth* v. *Porter*, 10 Met. 263, as declaratory of the law of Massachusetts upon this subject, and as it has been since understood. But as the question now comes up in a more solemn form, and involves a grave constitutional power, it has appeared to me to be worthy of the subject and of the occasion to examine it more at large than seemed to be necessary in deciding an ordinary question of law. Besides, with reference to another part of this discussion, it seemed to be useful to take something of a historical view of the origin and progress of the English common law on this subject, and how it stood at the time of the Declaration of American Independence, at which time the English common law ceased to have any operation, and by adoption became the common law of Massachusetts. This will be found most useful in construing the provisions of the Constitution soon after made, and the views and purposes of the wise and enlightened statesmen who laid the foundations of our present government.

I will now proceed to the case more immediately before us. It appears to me that the statute of 1855, *c.* 152, construed according to all the soundest rules of exposition, the pre-existing state of the common law, all statutes in *pari materia*, and the Constitution, which is part of the law of the land, did not alter, but was only declaratory of the existing law; and that ·it was not the purpose of the legislature to authorize a jury to adjudicate the law otherwise than by a general verdict. If this was a verdict of " not guilty," it was not subject to exception, and therefore their finding would be conclusive; but if there was a general one of " guilty," it was taken subject to exception on the part of the defendant; both of which were precisely the same before the statute. Besides, they were " to try according to established forms and principles of law." That clause gave full effect to the great fundamental principle of the common law, vesting in judges the authority to adjudicate all questions of law, and giving the jury the power to adjudicate on all questions of fact, and sanctioning the usual form of doing this by a general verdict, which, for reasons already stated, would be conclusive, in case of acquittal, of the whole case, or they might find a special verdict. So it was made the duty of the court to superintend the trial, to decide upon the admission and rejection of evidence and upon all questions of law raised during the trial, and charge the jury and allow bills of exception. It often happens that the decisive ₀and turning question of law, upon which the whole case depends, arises during the course of the trial, and yet the court are to decide on it. So the court must decide upon the admission or rejection of evidence, and yet the question, whether particular evidence is competent or not, depends upon the facts put in issue, and those again depend upon the decision of the main question, to be first ruled by the court. Supposing the question to be upon the construction of a 'penal statute, the court must first interpret the statute, and decide authoritatively what are the acts which, by the true construction of the statute, the legislature intended to punish, and then the evidence admissible must be limited to proofs offered which have a legitimate tendency to prove or disprove those facts. So

the court may allow exceptions; this must be limited to the exceptions of the defendant, for such was the principle of law.

In every view in which we consider this statute, it appears to me to be declaratory only, and not to alter the law, or vest in the jury a power to adjudicate questions of law, contrary to the ruling and adjudication of the law by the court in the same case.

If then the court, on a jury trial, are asked to instruct the jury that they have a legitimate right and power under this statute to adjudicate the law against the ruling of the court, in my judgment the answer should be that they have not.

If they be asked to instruct the jury that they have a right to return a general verdict, and that by doing so their verdict will be conclusive both on the law and the fact, if it be in favor of the defendant, in my judgment the answer ought to be that they have.

For the reasons before given, I am of opinion that the statute of 1855, construed as I think it must be according to all the established and approved rules of exposition, was not intended by the legislature to change, and has not, in its legal operation and effect, changed and varied the provisions of law prescribing and limiting the relative powers and functions of judges and jurors in criminal trials. The language is, that "it shall be the duty of the jury to try, according to established forms and principles of law," all criminal cases committed to them, and "to decide by a general verdict both the fact and the law involved in the issue, *or* find a special verdict." The ambiguity lies in the words "try" and "decide by a general verdict." The argument is, that from and after the passing of this statute the jury have a right to adjudicate, by the exercise of their own reason and judgment, and decide against the direction of the court, though received and well understood, whether there is such a rule of law; if a statute, what is the legal meaning and effect of it, what does it prescribe, and under what qualifications and limitations, and whether or not it is repugnant to the Constitution of the United States or of this Commonwealth, and according to their judgment in matters of law, contrary to the

19*

direction of the court, to acquit or convict a party accused. If these words, "try" and "decide by a general verdict," under the limitation stated, were intended by the legislature to have the construction contended for, and can properly bear that construction—and from the various interpretations put upon the statute by judges of the superior court of Suffolk and the judges of the court of common pleas in other counties, who alone are called upon to try all criminal cases except capital, and therefore, in the first instance, to lay down the law for the case, I am bound to believe that the statute may admit of that construction—then it becomes necessary to consider its constitutionality. And in my opinion a statute, which should in explicit terms provide that a jury should have such a power as that claimed to be conferred on them by this statute, would be repugnant to the Constitution of the Commonwealth, and to that extent inoperative and void.

In discussing this question we must consider the common law of England, slightly modified in operation in the Colony and Province of Massachusetts. as it stood in 1776, at the time of our Declaration of Independence, and as it was understood at the time of the adoption of the Constitution in 1780. That constitution, in all which bears upon the question we are now considering, has remained unchanged to the present time, and therefore we are to look to the principles and provisions of that constitution in both its departments, the Declaration of Rights, and the Frame of Government, to ascertain its true construction, and upon every part of it. In coming to that construction I think we are bound to examine it in no nice, criticising spirit, but to take the broadest and most liberal view of it, with a reverential regard to the great objects and purposes of its founders. The object manifestly was, in all truth and sincerity to establish a system of government for a free people, permanent in its character, equitable in its principles, not only recognizing and declaring the equal rights of all to the enjoyment of life, liberty, property and reputation, but providing for the maintenance and security of those rights against all encroachment, as far as the lot of humanity would admit, by the enactment, the adminis-

tration and the execution of fixed and standing laws. These are fundamental principles of the Constitution, and we are not only warranted in the use of the terms by the Constitution itself, but are admonished that a frequent recurrence to these principles is absolutely necessary, to preserve the advantages of liberty, and to maintain a free government. Declaration of Rights, art. 18.

One favorite and leading idea of the authors of this constitution was, that in entrusting and distributing the great powers of government, which must be large in order to be efficient, safety was to be sought, where practicable, by a system of checks and balances ; so three coördinate branches of government are established, and great solicitude manifested to keep them separate and distinct, the executive, legislative and judicial. In providing for the making of laws, the power is vested in the governor and two distinct assemblies of delegates, each having a negative upon the other. It seems to have been consonant to this prevailing idea, that the two great functions of judicial duty, the one of declaring the law, and the other of adjudging on the facts, should be performed by functionaries, each best adapted to perform its appropriate duty ; the one, the former, to be vested in judges, as free, impartial and independent as the lot of humanity will admit ; Declaration of Rights, art. 29 ; and, " in criminal prosecutions, the verification of facts in the vicinity where they happen is one of the greatest securities of the life, liberty and property of the citizen." Declaration of Rights, art. 13.

This corresponds to the old law, facts to be tried by experienced men, conversant with affairs, drawn from the " vicinage," now settled to be the county, serving temporarily and then dispersing ; and courts of law of last resort, to be held by judges trained to the law, permanent in tenure of office, and having jurisdiction over the whole commonwealth.

Another leading idea which pervades the whole system—Preamble, Declaration of Rights and Frame of Government—is the absolute necessity to the peace, harmony and tranquillity of the citizens of a free government that the laws under which they

live be fixed and settled. They manifestly had in view the consideration often alluded to in works popular at the time, expatiating on the misery and wretchedness of a people where the laws are uncertain, vague and fluctuating, prescribing one rule to one man and a different one to another, this day punishing and tomorrow exempting from punishment, under the same circumstances, so that no man, be he ever so honest, can know by what rule of law to square his conduct, faithfully perform his social duty, and avoid the penalties of the law.

President Adams, who, according to historical evidence, sub mitted the original draft of a constitution, and who exerted a commanding influence in the convention, in defence of the Constitution, has some significant passages indicative of this strong prevailing sentiment. It is curious to find here, as apparently taken from Harrington, the original of the sententious and expressive words with which the Declaration of Rights closes, namely, " to the end that it may be a government of laws and not of men." I cite but a passage or two from Mr. Adams : " Although there may be unjust and unequal laws, obedience to which would be incompatible with liberty ; yet no man will contend that a nation can be free, that is not governed by fixed laws. All other government than that of permanent known laws is the government of mere will and pleasure, whether it be exercised by one, a few, or many." " Well ordered governments were those where the law prevailed. Harrington says : ' Government *de jure,* or according to ancient prudence, is an art whereby a civil society of men is instituted and preserved upon the foundation of *common interest,* or, to follow Aristotle and Livy, *it is an empire of laws and not of men.* " " All men must agree that there can be no uninterrupted enjoyment of liberty, nor any good government in society, without laws, or where standing laws do not govern." " The great question therefore is, what combination of powers in society, or what form of government, will compel the formation, impartial execution and faithful interpretation of good and equal laws, so that the citizens may constantly enjoy the benefit of them, and may be sure of their continuance." 4 John Adams's Works, 403, 404, 405, 406.

The nature of that security and safety to be derived from the operation of the law may be ascertained by the whole tenor of the Constitution.  It makes ample provision for the enactment and promulgation of good and wholesome laws, to be carried into effect by suitable penalties.  But it would be in vain to make laws if they were not steadily applied and enforced.  An eminent and judicious writer on criminal law (Beccaria on Crimes) has said, that certainty in the infliction of punishments is much more essential to their efficacy, than the severity of them.  Wherever laws, however wise, discriminating and salutary, through any defect in the administration of justice, should fail to inflict the proposed punishment upon the actually guilty, they would fail to command the respect and obedience of the subject, which is their sole object.  But whilst the Constitution is so solicitous to ensure the punishment of the guilty, it is still more anxious to provide that these laws, in their application to individual cases, in a regular course of the administration of justice, whilst they are certain to reach the guilty, shall as certainly protect and shield the innocent.  This is required, not only in justice to the individual who may be accused without just cause, either through honest though groundless suspicion, or through private malice, or public prejudice, but it is also nec essary to the dignity and efficacy of the law itself, which is as much mistaken in its object, and dishonored, when it falls upon the innocent, as when it suffers the guilty to escape.

Such being the certainty at which the Constitution aims, in providing for the administration of criminal law, we are next to see what means it has taken to secure that certainty.

The Constitution provides that, in every charge of crime, the party accused shall be entitled to a trial by jury.  Declaration of Rights, art. 12.  We have already cited art. 13, as to the verification of facts in the vicinity where they happen.  The two provisions in effect declare, that every party accused shall be entitled to have the facts tried by a jury of the county ; and in most cases his guilt or innocence of the offence charged turns upon the truth of the facts alleged.

But every such trial puts in issue the law as well as the fact

and if certainty is essential in determining the facts in each case, *à fortiori* is it absolutely necessary in determining the law, which must not only govern that case, but the case of every other person in the Commonwealth. To see the difference between an adjudication of the law and the fact, we look at the difference in the nature of the two questions. The facts in each case differ from those of every other, and therefore the decision of one by a jury affords no precedent for the decision of another.

By the old established rule of the common law, when a rule of law is once judicially determined and adjudged by the court of last resort, it does become a precedent and rule of law for all similar cases, till altered or repealed. But this does not stand mainly or principally upon authority. It arises from the very nature of the subject. The decision of facts depends upon the evidence in the particular case ; but the decision of a question of law depends upon a consideration of principles always the same, fixed and immutable ; whether it be the principles of natural justice, ancient or modern statutes, or customary and unwritten law ascertained by precedent and tradition ; still the elements from which the decision must be drawn are unchangeable. New statutes may be passed, new questions may arise, leading to new discussions and judicial determinations, adapting established principles to such new cases ; hence the advancement, and, we may hope, improvement, in exactness in the science of jurisprudence. This embraces necessarily the validity and interpretation of new statutes. Statutes may afford occasion for such interpretation, arising from the uncertainty of language ; if language were exact enough, and the words of a statute were copious enough to express the precise and full meaning and intention of the legislature, and no more, there would be less frequent call for interpretation ; but in the actual condition of written language, and in the usual practice of legislation, we cannot expect such exactness.

Now, when a new statute is passed, and a question of law is raised by counsel, it must first come before the court charged by law with the conduct and superintendence of a jury trial ; and

in any well ordered system of jurisprudence, provision is made that it be reëxaminable by the court of last resort. When this question is definitively adjudged by the tribunal of last resort, the principles on which it is adjudged being immutable, and the rule of law adjudged in any one case being equally applicable to every other case presenting the same facts, the decision is necessarily conclusive of the law. I do not say how, and after what consideration, it may be considered as definitively decided; in the first instance, it may be misunderstood or feebly presented, it may have been misapprehended by the judges and not considered in all its bearings, or they may have wanted time and means for a careful and thorough investigation, and may therefore consent and desire to reconsider it one or more times. But I only say that, when thus definitively adjudged, the decision must be deemed conclusive and stand as a rule of law. When therefore such judicial construction has been put upon a statute, it becomes as essentially a part of the law as the text of the statute itself. Various questions may arise on the same statute, as it is drawn in question in the judicial administration of the law, and the judge will decide each question as it arises, subject to such reëxamination and final adjudication; and it is such final adjudication, so made in the actual administration of the law in particular cases, which thus becomes, in legal effect, an essential part of the rule of law created by such statute.

But the force and weight of this established principle of the common law are greatly enhanced in this commonwealth, by embodying the principle and substance of the system of government in a written constitution. It is expressly declared, in the last clause of the Frame of Government, that this form of government shall be enrolled on parchment, and be a part of the laws of the land. As the Constitution cannot be revoked or changed by any power short of that of the sovereign people who established it, it follows that it is a fixed and permanent law, binding upon the conduct and upon the consciences of all officers and subjects, and of all departments of the government.

But there is another consideration of still greater weight.

The Constitution has prescribed limits to the powers of the legislature, and has provided a coördinate, and, as far as practicable, independent department of government, to wit, a judicial department, to decide whether, in any particular act of the legislature having the forms of law, the legislature have exceeded their constitutional powers, and if they have, to adjudge the enactment inoperative and void. To the judicial department is also entrusted the power to decide upon the constitutionality of the acts of the executive.

I will now examine the provisions of the Constitution somewhat in detail, because, as I have said, I think the character of the Constitution, as an equitable and permanent government for a free people, is rather to be learned from its general tenor and pervading spirit than from any specific provisions.

Even in the preamble is found the germ of the three distinct departments of government. "It is the duty of the people, in framing a constitution of government, to provide for an equitable mode of making laws, as well as for *an impartial interpretation* and a faithful execution of them."

In the Declaration of Rights are various clauses bearing on the subject. After various articles declaring equality of rights, that government is to be established for the common good of all :

"Art. 10. Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws."

"Art. 11. Every subject of the Commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property or character. He ought to obtain right and justice freely," &c., "conformably to the laws."

Art. 12. This article is long, and the whole article is applicable to the subject we are discussing. It provided for several changes in the administration of criminal law. It saved the accused from being compelled to confess, or furnish evidence against himself; it secured to him a right to produce all proofs favorable to him, (contrary to the rule which had prevailed in

the ruder ages of the law—at one time, that the accused should call no witnesses, at another that he should not have the benefit of having them sworn, so that their testimony might have the same sanction with that of the witnesses against him ;) it secured a hearing by counsel in his defence ; it declared that he should not be punished or deprived of his property, but by the judgment of his peers or the law of the land ; but to make this more certain and explicit, the last clause is added : " And the legislature shall not make any law that shall subject any person to a capital or infamous punishment, except for the government of the army and navy, without trial by jury."

It was a provision for securing to all the great benefit of jury trial, as it was then understood and practised.    As then understood, the indictment set forth the facts specifically, alleging that which constituted an offence by force of existing laws.    If the defendant pleaded not guilty, both the fact and the law were put in issue, and thereupon the issue thus joined was brought before a court and jury for trial.    The judge ruled and charged the jury upon all questions of law ; the jury, under those directions, considered all the competent evidence, with a view to an adjudication upon the truth of the facts.    They might bring in a special verdict upon the facts, submitting the law to the court ; but as this would be difficult in practice for unlettered men, conversant with affairs, but not familiar with the forms of law, by far the most easy, simple and direct course, and an acknowledged legal course, was to return a general verdict. This form of general verdict embraced a decision both upon the law and fact, each by its appropriate organ.    And both law and fact were thus legally adjudicated ; the decision of the judge on the question of law being given to the jury, and their decision upon the fact being combined with it.    This verdict was taken to be conclusive of both.    The judge could only rule hypothetically, if they found so, then the law was so ; otherwise, the law would be otherwise.    If the jury found in conformity with the direction of the court, then the verdict did truly embody answers to both the law and the fact, each by its proper organ. If the jury found against what appeared to be the direction of

the judge, still in theory of law it was right and conclusive; they were conclusive judges of the fact, they had means of judging which the court could not have, and then the legal presumption is, that they did not find the facts true according to the hypothesis upon which the judge gave his directions, and therefore that the verdict was right. If the law was ruled unfavorably to the accused, and the jury convicted him, all was right, both concurred. But in the same case, if they acquitted him, he went free; because by the record it so appears, and the law presumes he was rightly acquitted on the fact; and this was irreversible, on several grounds of humanity and tenderness to all persons accused of crime.

The public prosecutor, in case of acquittal, can have no writ of error and no bill of exceptions, because no one shall be twice put in jeopardy for the same cause; and the only purpose of a bill of exceptions sustained would be, not to reverse the judgment and enter a judgment against him, but to send him to a new trial before another jury.

Nor is this result of a general verdict of " not guilty," making it irreversible and conclusive in favor of the accused, an exception to the general rule of law. The law does not seek a verdict of conviction but upon evidence beyond all reasonable doubt, and though he may be in fact guilty, the verdict of twelve men upon the same facts does create some reasonable doubt. Then comes in another maxim, which is not only founded in humanity, but upon the soundest principle of criminal law, which would be weakened and disparaged by inflicting punishment on an innocent person under the forms of law, that it is better that nine guilty persons should escape, than that one innocent man should suffer. It is therefore equally consistent with sound law and with true wisdom, that when one is acquitted by a general verdict of " not guilty," he should forever be discharged from that accusation. This modification and application of the principle, " *ad quæstionem juris non respondent juratores,*" is as well established as the rule.

But if the judge instructs the jury against the accused, and the jury convict him, he may have a bill of exceptions;

and if, upon reëxamination in the court above, it is found that the instruction was incorrect in matter of law, the verdict shall be set aside, and he shall have a new trial under right instructions in matter of law. This shows the humane and tender regard which the law has for the rights of the accused.

But there is one other alternative, that is, that the court instruct the jury in favor of the accused, and yet the jury convict him ; at law, he can have no redress. He cannot file exceptions, because the law was decided in his favor. If the jury could definitively decide the law against the decision of the court, then, notwithstanding the evidence was wholly insufficient to bring the case within the statute, as the court construed it and directed them, yet it might be quite sufficient to bring it within the penal operation of the statute, as the jury understood and decided it, and that would be conclusive. It would equally deprive the party, thus convicted against the direction of the judge, of a remedy by new trial, which it is conceded the court have a right to grant, and which has been resorted to in modern times to correct errors and mistakes, and the consequent injuries which would arise in the conduct of this most excellent and salutary mode of trial in criminal cases.

Here it is therefore that parties accused have need of the protection of the law, which the Declaration of Rights and the entire Constitution promise them. Take the illustration before given, of an indictment on the statute for the sale of lottery tickets. Several persons, from pure motives of charity, agree to advance five dollars each for the relief of a deserving person, an artist, it may be, who has a picture worth possibly one hundred dollars somewhere, but which he cannot sell. They agree to take it, and decide by lot who shall have it. The question is, whether this was within the penalties of the statute. The judge decides that it is not ; the facts are unquestionable. The jury, yielding perhaps to a popular feeling that though lotteries were once sanctioned as a means of affording public charity, yet now they are odious and pernicious, and the raffle in question was a lottery, convict the accused. The interpretation of the statute being part of the statute, and the direction of the judge being

conclusive till reëxamined, of course conclusive for that case, the verdict of the jury, that the offence is within the statute and punishable, is directly contrary to law, there is no means provided for reëxamining it, and therefore the accused is convicted against law, without redress. He is deprived of that protection of the law which the Declaration of Rights assures to him.

The case seems to have been argued as if the only object of the Constitution, in securing a jury trial, is to rescue a party accused from the grasp of the public prosecutor, and that all the propensities of the judge are in favor of the public prosecutor. But the Constitution countenances no such theory; on the contrary, it is solicitous to make the judge impartial and independent, so that he may throw the broad shield of the law over an innocent man who is entitled to its protection, whilst it gives a true direction to the weapon of the law to punish those who have been guilty of its violation.

We now resume the examination of the Declaration of Rights, which concur in affirming the foregoing to be a correct view of the jury trial, which the Constitution intended to establish and make perpetual.

" Art. 29. It is essential to the preservation of the rights of every individual, his life, liberty, property and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by *judges* as free, impartial and independent, as the lot of humanity will admit. It is therefore not only the best policy, but for the security of the rights of the people, and of every citizen, that the judges of the supreme judicial court should hold their offices as long as they behave themselves well, and that they should have honorable salaries, ascertained and established by standing laws."

This clause offers several remarks. The term " judges," if this stood alone, might be supposed to be used in its large and general sense, including all who are called to judge upon any thing, and so include jurors. But here it is limited, by its connection and context. After declaring the general truth, that

judges should be as free, &c., it goes on to draw the conclusion, " it is therefore not only the best policy," &c., " that the judges of the supreme judicial court should hold their offices," &c. It appears clear therefore that, in this connection, it means judges of law, judges commissioned, having a permanent tenure of office, meaning the same designated in the Frame of Government as judicial officers.

Then why is special provision made for the independence of the judges of the supreme judicial court, except it be that, in every well ordered system of jurisprudence, all questions of law are ultimately to be adjudged by such supreme judicial tribunal, and for the very reason that, when so decided, their determinations are authoritative expositions, constituting part of the law of the land, and therefore ought to be certain and uniform throughout the Commonwealth ?

Art. 30. The last article is very significant, especially coming, as it does, as a conclusion of all the rest.  " In the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them ; the executive shall never exercise the legislative and judicial powers, or either of them ; the judicial shall never exercise the legislative and executive powers, or either of them ; TO THE END IT MAY BE A GOVERNMENT OF LAWS AND NOT OF MEN."

This clearly marks the distinction between the three great powers, executive, legislative, and judicial, creates three distinct departments for their exercise, makes them as far as possible independent of each other, and in terms prohibits the encroachment of one upon the other.

It declares the end of all good government to depend on the honest execution of good laws.  In its application to judicial power it intimates, that the judicial power, when it shall duly and deliberately pronounce its behests, shall be, as nearly as consistently with human passions and infirmities it can be, the pure voice of the law.  The security of the public, in the right and pure administration of the law, punishing offences, and the security and protection of individuals rightfully or wrongfully accused, are made to depend, not upon the supposed interests,

20 *

proclivities, or even honest and well founded opinions of the men, who happen in any department to be the organs through which its behests are uttered, but the voice of the law.

There are a few clauses only, in the Frame of Government, to which I think it important to allude. "All judicial officers shall be nominated and appointed by the governor, by and with the advice and consent of the council." *c.* 2, § 1, art. 9. "Permanent and honorable salaries shall also be established by law for the justices of the supreme judicial court. And if it shall be found that any of the salaries aforesaid so established are insufficient, they shall, from time to time, be enlarged, as the general court shall judge proper." *c.* 2, § 1, art. 13. "The tenure, that all commission officers shall by law have in their offices, shall be expressed in their respective commissions. All judicial officers, duly appointed, commissioned, and sworn, shall hold their offices during good behavior, except such concerning whom there is different provision made in this constitution: Provided, nevertheless, the governor, with consent of the council, may remove them upon the address of both houses of the legislature." *c.* 3, art. 1.

These are all the passages which it seems necessary specially to cite. I think the result is, that the Constitution most sedulously endeavors to provide for a government of fixed, permanent laws :

That this certainty depends in a great measure upon having a steady, fixed and uniform interpretation of the laws and administration of justice, including all questions of the constitutionality and validity of legislative enactments of the legislature of the State or of the United States :

That the better to secure this certainty and uniformity, the constitution provided for a distinct judicial department with whom this power was to be deposited, and by which alone and exclusively it was to be exercised :

That this was committed not to one judge or set of judges, but to a judicial department, constituted, as such department had ever been under the prior governments of Massachusetts, of one superior or supreme court, and as many subordinate courts and judges as the public exigencies might require, and to operate

as such a department must operate in systems following more
or less closely the common law, which is, that the judge holding
a jury trial, in a criminal case, will declare the law of that case
to the jury, subject, if the jury convict, to be revised by the
highest legal tribunal, so that the law may be ultimately and
definitively decided by the tribunal of last resort having juris
diction coextensive with the commonwealth :

That the legislature have no authority themselves to exercise
the powers of the judicial department, nor take away this essen-
tial attribute of jurisprudence, nor vest it in any other depart-
ment, or in any other persons or classes of persons; and that
jurors, though they have important duties to perform, in courts
of justice, yet do not compose an essential element of the judi-
cial department; that their duties are limited and temporary,
and the necessity of the attendance of juries and a trial by them
is distinctly provided for by the Constitution, and their function
in such trial was well understood to be the finding of facts, upon
evidence, under the direction of the court.

In conclusion, in the view I take of the Constitution, as a
whole and in all its details, in its pervading spirit, as well as in
its form and substance, it was the great purpose of its founders
to provide a system of free government for all coming time ; to
this end to ensure certainty in the making and administration
of laws; to secure the peace of the whole, and the protection of
every individual, by that certainty which shall make it affect every
subject alike, as well in its protecting safety, as in its restrain-
ing efficacy.    To ensure that certainty, it was indispensable
that there should be a faithful, firm, and uniform administration
of law, deciding on the constitutionality and interpretation of
every written law, the existence, exposition and judicial applica-
tion of all rules and maxims of the common law, of natural,
customary and unwritten law, incident to the trial of criminal
and civil causes.    This was carefully provided for by a distinct,
coördinate judiciary department.

The founders of our constitution understood, what every re-
flecting person must understand, from the nature of the law, in
its fundamental principles, and in its comprehensive details, that

it is a science, requiring a long course of preparatory training, of profound study and active practice, to be expected of no one who has not dedicated his life to its pursuit; they well understood that no safe system of jurisprudence could be established, that no judiciary department of government could be constituted, without bringing into its service jurists thus trained and qualified. The judiciary department was intended to be permanent and coextensive with the other departments of government, and, as far as practicable, independent of them; and therefore it is not competent for the legislature to take the power of deciding the law from this judiciary department, and vest it in other bodies of men, juries, occasionally and temporarily called to attend courts, for the performance of very important duties indeed, but duties very different from those of judges, and requiring different qualifications.

If therefore the statute of 1855, *c.* 152, in providing that it shall be the duty of the jury to decide, at their discretion, by a general verdict, both the law and the fact involved in the issue, can be so interpreted as to prescribe that the jury, consistently with their duty, may decide the law, upon their judgment, contrary to the decision and instruction of the court before whom the trial is had, as received and understood by them, such enactment is, in my opinion, beyond the scope of legitimate legislative power, repugnant to the Constitution, and, of course, inoperative and void. In all those cases, therefore, in which a different direction has been given by any judge to a jury as the true interpretation of the statute, or affirming its constitutionality, exceptions to such rulings must, in my opinion, be sustained. If the statute will not bear that construction, but was declaratory only, it did not change the preëxisting law, then for that reason such instructions as above stated were given without warrant of law, and exceptions to them must in like manner be sustained.

Regretting that, after full deliberation of all the judges, we have not been able to come to one and the same result, I am authorized to say, that in this opinion my brethren Metcalf and Merrick, JJ. concur.

DEWEY, J. The present case is certainly one entitled to the fullest and most deliberate consideration, involving, as it does, the grave question of the proper province and duty of jurors in criminal trials, under the existing laws of this commonwealth.

The origin and early history of trial by jury are as yet involved in great obscurity. We find no legislative act creating it and defining its powers. Certain it is, that its distinctive features and duties, as early developed, have been greatly modified, and from time to time materially changed. As a part of our system of criminal jurisprudence, we take it as we find it at the date of our independence as a nation, modified by our subsequent organic and statute law applicable thereto.

The precise extent of the legitimate powers of the jury in criminal cases, at common law, has been a fruitful theme for legal, as well as popular discussion.

To some extent, distinctions exist between trials in criminal and civil cases. In the former, the powers of the jury, through the effect given to a verdict of acquittal, are, it is conceded, incidentally greater. A difference also exists in the two cases in the manner of empanelling the jury, in the appointment of their foreman, in the form of the oath administered to them, and in the manner of returning their verdict.

But whether at common law the jury have, in criminal trials, the right to decide both the law and the facts, and whether they may lawfully and properly exercise this power by a general verdict, is a point upon which the opinions of learned jurists are in direct conflict. I do not deem it either useful or expedient to enter upon the discussion of that question. It has been considered very elaborately and ably in the cases of *Pierce* v. *State*, 13 N. H. 536; *State* v. *Croteau*, 23 Verm. 14; *United States* v. *Battiste*, 2 Sumner, 240; *United States* v. *Morris*, 1 Curt. C. C. 48; and *Commonwealth* v. *Porter*, 10 Met. 263; and the authorities and grounds of argument, both for and against the right of the jury to decide the law as well as the fact, in criminal trials, are fully presented by those cases.

It is sufficient, in my view, upon this point, to say that, after a very full argument and deliberate consideration of that ques-

tion, which was supposed to be involved in the question raised by the bill of exceptions, in *Commonwealth* v. *Porter*, 10 Met. 263, this court then came to the opinion that the jury were to receive the law from the court, and to conform their judgment and decision to the instructions of the court in matter of law.

The question there arose, it is to be remembered, as a question entirely unaffected by any statute of Massachusetts, author- izing the jury " to decide at their discretion, by a general verdict, both the fact and the law involved in the issue." It was wholly a question of the right of jurors under the common law, as administered in this commonwealth. This court however, while they adopted the doctrine already stated, that the jury were to receive the law from the court, also as distinctly held that it was the right of the counsel of the defendant to address the jury upon questions of law embraced in the issue ; such prac- tice, as was said in the opinion of the court pronounced in that case, being " warranted by the long practice of the courts in this commonwealth in criminal cases." 10 Met. 287. This latter ruling has sometimes been considered by other judicial tribu- nals, and those having occasion to discuss the more general question, as not being in entire harmony with the other ruling in *Porter's case*, declaring that the jury had not the right to decide both the law and fact, but were bound to adopt the instructions of the court in matters of law. That decision upon this controverted question of the rights of jurors, thus pro- nounced by our highest judicial tribunal, is to govern the present case, unless some new enactment, emanating from the legis- lative authority, requires us to modify that opinion.

This brings us directly to the inquiry, has there been any change in the law in this respect since that opinion was pro- nounced ? Those, who maintain the right of the jury to decide both the fact and the law involved in the issue in criminal cases, insist that the *St.* of 1855, *c.* 152, has conferred that right upon the jury, either as a new enactment, or as a declaratory act, declaring what the common law is and has been upon that sub- ject. On the other side, it is contended, that this statute, prop- erly construed, has no such effect in enlarging the powers of

jurors to decide both law and fact; and that its only object was to secure, more effectually and fully, the right of a jury, at their election, to return a general verdict, or a special one, but with no greater powers than before, as to deciding the law involved in the issue.

This statute is therefore to be construed; and the question is not whether the provisions of the act are as plain and direct as would be desirable in an act " concerning the duties and rights of jurors," as this act is entitled, but whether, giving proper effect to its language, and construing it by the same rules by which other statutes are to be construed, it was not the purpose and effect of the act essentially to modify and change the law as declared by this court in *Porter's case.*

Legislation is usually resorted to, not to reaffirm existing laws or decisions of the court, but to correct some supposed defect or omission in former statutes, or to introduce some change in the law as administered and declared by the court. In our elementary books we have as rules given us for construing statutes : 1. To see what the old law was; 2. What was the mischief complained of ?

If it be true that the only purpose of the *St.* of 1855, *c.* 152, was to confer upon the jury the right to return, at their election, a general or special verdict, then there was no occasion for this statute. This right, on the part of the jury, to return a general verdict of guilty or not guilty, or a special verdict, finding merely the facts, and submitting the question of law to the court, has immemorially existed, has been always practised upon, and has never been questioned by any court in Massachusetts. There was, upon this construction of the statute, no defect in the old law ; and no mischief complained of, which called for any remedial statute. On the other hand, we cannot shut our eyes to the fact, that there had been recently promulgated the decision of this court in *Porter's case,* already referred to; and that, to a certain extent, there was an opinion in the community, adverse to that decision. Those entertaining such views of course thought the existing laws defective, and the mischief complained of by such persons was that the jurors were not allowed,

in criminal cases, to have the right to take the final responsibility of deciding upon the law, as well as the facts, by their verdict. This state of things may have led to the enactment of a new statute changing the law; and the further inquiry is, whether the language of the statute indicates such purpose.

I find the language of it to be thus : " It shall be the duty of the jury, after having received the instructions of the court, to decide, at their discretion, by a general verdict, both the fact and the law involved in the issue, or to find a special verdict at their election." It is true this power, thus conferred upon the jury, is surrounded with many other provisions, intended as checks or preventives of those evils which might naturally arise from placing in the hands of the jury the power to decide both the law and fact in criminal cases. But those other provisions more fully confirm me in my views of the intention of the framers of the statute to give the jury the right to decide both the law and the fact involved in the issue, if they elect so to do. If this statute confers no right upon jurors beyond that of authorizing the jury to return a general or special verdict, at their election, why the provision in this statute, " it shall be the duty of the jury to try, according to established forms and principles of law, all causes which shall be committed to them " ? Why the enactment as to " the duty of the court to superintend the course of the trials, to decide upon the admission and rejection of evidence, and upon all questions of law raised during the trials, and also to charge the jury and to allow bills of exception," and their authority to " grant a new trial in cases of conviction " ? All these provisions were uncalled for, unless required by something in the statute, enlarging the powers and rights of the jury. These were duties required by the then existing laws, duties always conceded and exercised. Their introduction into this statute can only be accounted for upon the hypothesis, that there had been some new power conferred upon the jury, and that it was necessary to guard this new power by throwing around it all the security for its proper discharge that could result from such other provisions.

If the statute had simply declared, that the jury might decide

both the law and the facts in the case, in criminal trials, it might be supposed that the court would assume that they had no duty devolving on them to charge the jury in matter of law, or to decide any questions of law arising in the progress of the trial. Hence the necessity of the provisions that the court should, as heretofore, direct the course of the trial, and decide upon all questions of law raised at the trial; and that the court should charge the jury, that thereby the jury might be informed from the court what the law was, as held by the court; thus leaving the jury to act not without light, and the full benefit of the knowledge and learning of the judicial mind, and under all the responsibility that would attach from deciding the law contrary to the instructions of the court. So also as to the provision in this statute, that the court may set aside the verdict and grant a new trial in cases of conviction; this was a power well known to exist by force of previous statutes, and totally unnecessary to be here introduced if there had been no change enlarging the duties and rights of jurors. It could have been reasserted here only to remove all doubts upon the point, that, by conferring the right upon the jury to decide the law and the fact by their verdict, the legislature did not mean to deprive the party on trial of the long enjoyed right, to apply to this court to grant a new trial, when the verdict was, in the view of the court, contrary to law or the evidence. It is to be remembered that the same form of expression is adopted in reference to the action of the jury as to that of the court. The court are "to decide" upon the admission of evidence. The jury are "to decide," at their discretion, by a general verdict, both the fact and the law involved in the issue.

If it be said that the *St.* of 1855, *c.* 152, is a mere revival of *St.* 1807, *c.* 140, § 15, one answer to this suggestion may be, that while there is much similarity in the two enactments, yet there are many additional provisions introduced into the act of 1855, which strengthen very much the belief that this act was intended to introduce material changes in the subject of trial by jury. But if the leading provisions in each are similar, it should not perhaps change our views of the construction to be given

to the act of 1855. During the period of the existence of *St.* 1807, *c.* 140, which was until the 1st of May 1836, no question, so far as we know, was ever raised as to its construction, and no suggestion is known to have fallen from the bench, that its effect was not to give to the jury the rights now claimed for them in criminal trials. The opinion of this court, pronounced in 1830 by Putnam, J., in *Commonwealth* v. *Knapp*, 10 Pick. 496, is often referred to by those who maintain the right of the jury to decide the law in criminal cases, as conceding this right. However that may be, certainly nothing to the contrary was judicially declared during the existence of the *St.* of 1807, *c.* 140.

As it seems to me, the proper construction to be given to the *St.* of 1855, *c.* 152, is that, under its provisions, the jury may, by a general verdict, decide both the fact and the law involved in the issue. They are in the first instance to be instructed by the court fully in matter of law appertaining to the case. The organ selected to discharge this important duty is the judge, who, from his professional experience, long practice, and familiarity with this class of duties, is supposed to be a competent expounder of the law. His judicial rulings and instructions would usually be the sole guide of an honest juror in passing upon the case committed to him; but the statute has seen fit to clothe the juror with the power and the right, after he shall have repaired to the jury room, by a general verdict to decide both the law and the fact. But the jury are to try the case " according to established principles of law." They have no right to contravene the established principles of law.

The provision in the statute seems practically to be no more than this, that if the juror knows that the law has not been correctly stated from the bench, he may act upon such knowledge, and return a verdict in conformity thereto. In so doing he assumes a great responsibility, but that must rest with the conscience of the juror. In the language of Putnam, J., in delivering the opinion of this court in the case of *Commonwealth* v *Knapp*, it may be truly said, " the instructions of the court, in matters of law, may safely guide the consciences of the jury,

unless they know them to be wrong; and when the jury under-
take to decide the law in opposition to the advice of the court,
they assume a high responsibility." 10 Pick. 496.

This construction of the *St.* of 1855, *c.* 152, is decisive of the
present case, unless the statute is set aside as an unconstitu-
tional enactment. This opens the further inquiry, Is this statute,
if thus construed, in contravention of the Constitution of Mas-
sachusetts? If this be so, if in passing this statute the legis-
lature have obviously transcended the powers conferred on the
legislative department, it is the duty of the court to regard it as
entirely nugatory, and to give it no effect.

Proper respect for a coördinate branch of the government
should however lead us to assume that they have acted within
the limits of their constitutional authority, until the contrary
shall be clearly made apparent. It must be shown affirmatively
that the statute in question contravenes some constitutional
provision. If that is doubtful merely, our duty is to give effect
to the law thus enacted by a coördinate branch of the govern-
ment. These are familiar principles, always acknowledged, and
often stated.

By the organic law of the Commonwealth the whole law-
making power of the State is committed to the legislature, sub-
ject only to such restrictions as are expressed or implied therein.
This authority is very broad and general. By *c.* 1, § 1, art. 4, full
power is given " to make all manner of wholesome and reason-
able laws, so that the same be not repugnant or contrary to this
constitution, as they shall judge to be for the good and welfare
of this commonwealth, and for the government thereof." This
delegation of power is certainly ample authority for enacting
the *St.* of 1855, *c.* 152, unless there be some prohibition or limit-
ation in this respect, found in other parts of the Constitution.
That must be shown by those who deny such authority. There
is no express provision forbidding the legislature to enlarge
the powers of juries in the trial of criminal cases. The only
supposed prohibition is that arising by implication from other
provisions in the Constitution, alleged to be inconsistent with
such exercise of legislative authority.

Our next inquiry is therefore what are these other provisions, supposed to be so far inconsistent with it as to operate as limitations and restraints upon the legislative power in this respect? Those relied upon are the following: The second paragraph of the preamble to the Constitution of Massachusetts, wherein it is declared that it is the duty of the people, in framing a constitution of government, to provide for an impartial interpretation and faithful execution of the laws; Art. 10 of the Declaration of Rights. "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws;" Art. 11. "Every subject ought to find a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property or character;" Art. 29. "It is essential that there be an impartial interpretation of the laws and administration of justice," and "it is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit;" and Art. 30, providing for the separation of the executive, judicial and legislative departments, "to the end it may be a government of laws and not of men." These principles are declared in the Constitution for the purpose of giving greater security to the subject's life, liberty and property. A new statute cannot be held to contravene any of these principles, unless it be found to interfere with the full enjoyment of the rights thus declared.

What would be the effect of a statute making the jury in the first instance the expounders of the law applicable to the case on trial, and restricting the court from ruling in matter of law, and upon the competency of evidence, and from granting new trials where the jury find a verdict against the party on trial, contrary to the views of the court, is not the present inquiry. The *St.* of 1855, *c.* 152, has not these elements. The law is to be stated by the court. The inquiry is therefore merely whether this statute, with all its collateral provisions, requiring the jury to try the case "according to the established principles of law," and requiring "the court to superintend the course of the trials, to decide upon the admission and rejection of evidence, and upon all questions of law raised during the

trials, and to charge the jury and to allow bills of exception," and authorizing them to grant a new trial in case of conviction, is unconstitutional, because in violation of the articles above stated, and not affording to the party on trial the full enjoyment of his constitutional rights.

The only effect of this statute is to deal more liberally with the party on trial, and grant him greater privileges than he had before. It gives full force and effect to a verdict of acquittal by the jury, however erroneous it may be. It allows the jury to decide both the law and the fact involved in the issue, and thus enables them to render a verdict of acquittal against the instructions of the court, if they will take the responsibility so to do. In case a verdict of guilty is returned by the jury, the prisoner has every provision in his favor that existed before the passage of the statute : first, by the court being required to perform the duties above stated during the progress of the trial ; secondly, by the full power given to the court, in case the jury return a verdict of guilty, to grant a new trial.

If it be said that it is impossible for the court to know upon what grounds the jury may have found a verdict of guilty, and therefore they cannot know but that the jury may have conformed to the opinion of the court in matter of law, and found the party guilty upon the evidence under such instructions, when in fact the jury disregarded the instructions of the court, and found the party guilty without the proper proof, it may be said, in reply, that although theoretically this may be so, yet it can hardly be possible that an intelligent judge, conversant with the trial and the questions in issue, will not easily understand whether the rulings of the court were disregarded by the jury. But if it be otherwise, the power of the court to set aside a verdict of guilty is not confined to cases where the jury may have disregarded the instructions of the court. They are to set aside the verdict as well where it is against the evidence, or without evidence, as where the jury have erred in matter of law. The whole case is before the court—the facts, and the questions of law applicable to them ; and if the case, for any reason, be it error in construing the law, or in weighing the

21 *

testimony, does not authorize a conviction, the court have full power to set aside the verdict.

The effect of the statute in question is, in my opinion, to increase the facilities for an acquittal of the accused, but it has no tendency to subject the party on trial to any increased danger of conviction and punishment. I see in it no violation of either of those parts of the Constitution to which we are referred. The party is tried " by standing laws." In the language of art. 12 of the Declaration of Rights, he is not " deprived of his life, liberty or estate, but by the judgment of his peers, or the law of the land." His judges are, as much as before, " as free, impartial and independent as the lot of humanity will admit ; " and the government is, as before, in the administration of the criminal law, in the language of arts. 29 and 30, " a government of laws and not of men," and there is the like " impartial interpretation of the laws and administration of justice."

The objection to this statute, if any exists, is not that the party on trial has not fully secured to him all the protection of his rights guarantied by the Constitution. It is the public who are most likely to suffer from the change made by the law, in the increased facilities to the accused to escape from conviction. But such legislation, however unwise, is not therefore unconstitutional. Lax criminal laws, furnishing facilities for the escape of the guilty from punishment, however censurable as proceeding from want of wise forecast in legislators, may be yet valid laws, and to be regarded and acted upon in courts of justice.

How far, and to what extent, it is competent for the legislature to legislate on the subject of jurors, it may be difficult to say with precision ; and certainly it would be a much more embarrassing question if the statute were in derogation of the rights of the jury, as they existed at the time of the adoption of the Constitution. But as no suggestion is or can be made, that this statute is in derogation of the rights of jurors, or of trial " by his peers," the constitutional objections to this statute must be found exclusively elsewhere than in those provisions securing the right of trial by jury.

The rights, powers and duties of the jury, as connected with

the administration of justice, have been the subject of great changes. At one time, it was a tribunal composed of none other than witnesses, and persons who, from their own knowledge, decided the case; and so far was this rule carried, that those who were returned as jurors, and alleged that they had no such knowledge, were declared incompetent, and their places filled by others who had this qualification.

By our colony laws it was enacted, that "whensoever any juror or jurors are not clear in their judgments or conscience, concerning any case wherein they are to give their verdict, they shall have liberty in open court (but not otherwise) to advise with any man they think fit to resolve or direct them before they give in their verdict." Another provision of the same statute bears upon the rights of jurors at that time, and may be thought perhaps to favor the position that there was a period in the history of Massachusetts when the jury dealt with the law; it being enacted, "that in all cases wherein the law is so obscure, so as the jury cannot be satisfied therein, they have liberty to present a special verdict, namely, if the law be so in such a point, we find for the plaintiff, but if the law be otherwise, we find for the defendant; in which case the determination doth properly belong to the court." Anc. Chart. 145.

In England, it has been thought a proper exercise of legislative power to secure more fully the rights of the jury in libel cases, as was done by *St*. 32 *G*. 3, *c*. 60, after the decision of Lord Mansfield in the celebrated *case of the Dean of St. Asaph*, 3 T. R. 428 *note*. It is true that there no questions of constitutional restrictions could arise, and nothing further is to be inferred from the passage of that act than that it was deemed a legislative, rather than a judicial matter, to prescribe the rights and duty of jurors in criminal prosecutions for libels. The legislation of the State of New York in 1805 is more to the point. There the legislature, after the decision of the court in the case of *People* v. *Croswell*, 3 Johns. Cas. 337, on an indictment for a libel, declared the jury in libel cases to have certain rights, which had been denied by the court as existing at common law. In consequence of that statute, the court unani-

mously ordered a new trial in *Croswell's case.* 3 Johns. Cas.
413. And I am not aware that any question was ever made
as to the authority of the legislature to enact it.

Our statute of 1807, *c.* 140, if it gave no other or greater power
to juries, certainly gave them the right to give a general or
special verdict, at their election. The same statute also mate-
rially abridged the power of the court in reference to the jury,
by depriving the court of the right, in civil cases, to send the
jury out after a second return into court without having agreed
upon a verdict.

In the case of *State* v. *Croteau,* already cited, Hall, J., who
pronounced the opinion of the majority of the court, holding
that at common law, in criminal cases, the jury were judges
of the law and fact, distinctly conceded that this was a subject
of legislation, saying: " If the legislature desire that jurors
should hereafter take the law in criminal trials from the court,
they can readily say so, and prescribe a mode for carrying their
will into effect." 23 Verm. 47.

For the greater public security, or, in the language of the
Constitution, " for the good and welfare of the Commonwealth,"
our legislature have, by statute, required the court, in capital
trials, to exclude from the panel any juror who entertains such
opinions upon the subject of capital punishment, as would pre-
clude him from finding a party guilty of a crime punishable
with death. Rev. Sts. *c.* 137, § 6. And as early as *St.* 1784, *c.* 7,
and by all the legislation since, jurors have been excluded from
the panel who had formed an opinion, or had any bias or preju-
dice in the case. Rev. Sts. *c.* 95, § 27.

We suppose no one would question the right of the legisla-
ture to provide by law for special or struck juries, in certain
difficult or peculiar cases, where such juries would be useful,
though no such practice now exists. Or, to take the case of
foreigners, it would be competent to provide by statute that, on
such trials, a jury *de medietate linguæ* should be empanelled,
although neither the *St.* of 28 Edw. 3, *c.* 13, nor any similar
provision on the subject, was adopted and practised upon here
before the time of the adoption of our Constitution.

It certainly is not to be assumed that a statute is in violation of the Constitution, because it is one affecting the administration of justice, or trials in courts of law. The legislative department has, from time to time, changed materially the powers of this court, by prescribing their jurisdiction; assigning one class of duties to a single judge, and others exclusively to the full bench; by enacting codes of practice in utter annihilation of the good learning and ancient doctrines of the bench, and prescribing new rules of evidence directly at variance with those of the common law, as held by the court. The whole system of equity jurisdiction, so deeply affecting the judicial department, and to some extent certainly removing from the jury questions properly within their province in trials at common law, is the creation of statute law. Such acts of legislation have not been considered any violation of the fundamental provision, that the judicial and legislative departments are to be kept distinct. The legislative power enacts the laws, the judicial interprets those laws, and administers them.

Having ascertained the legislative will, thus conveyed through their acts of legislation, it is the duty of the judiciary to give effect to it, unless plainly in violation of some constitutional provision. The rules that are to govern us in the discharge of that most delicate part of our official duties have been already suggested. Our respect for a coördinate branch of the government, acting under the like solemn obligation of duty as ourselves, requires us to assume their acts to be constitutional until the contrary is clearly established. After much consideration, I cannot say that my mind is satisfied that the provisions of the *St.* of 1855, *c.* 152, are in conflict with any limitations in the Constitution, express or implied. I am bound therefore to give it full effect while it remains upon the statute book.

The question has been raised in this case, whether there may not be a distinction as to the right of the jury to decide upon the meaning of a statute, and the right to decide upon its constitutionality. But the distinction is untenable; the authority given by this statute being " to decide the fact and the law involved in the issue." The power to decide the law necessa

rily includes the question of the constitutionality of the statute under which the offence is sought to be punished ; for if it be unconstitutional, it is no law, and the jury are not to regard it as of any effect, whatever may be its meaning. The fact, that the right of the jury to decide upon the constitutionality of the law is thus incident to the right to decide the law and facts involved in the issue, may add strongly to the objection to this statute on the ground of expediency and propriety. The question of the constitutionality of a law is ever a grave question, and one usually calling for the highest exercise of the judicial mind. It is a question which, when once settled, should be considered as forever settled, as to all persons and all cases. Such cannot, of course, be the result of a verdict of a jury, which settles nothing but the particular case. Its whole force is spent in the case. It decides nothing beyond it, and the same question is to be raised anew at each future trial. That it deprives the administration of the criminal law of that symmetry and uniformity which seems to be required, and which might be the more readily anticipated where one law and one rule only existed for all juries, is certainly no small objection to its usefulness. But these and other considerations, tending to show the law an unwise one, are solely for the consideration of the legislature. If this statute shall be found to be adverse to the proper and effective administration of the criminal law, a constitutional remedy is at hand, in the exercise of the legislative power to repeal or modify it, not because it is unconstitutional, but because it is not " for the good and welfare of the Commonwealth."

In conclusion, I am of opinion that it was the purpose of the act of 1855, *c.* 152, to give to the jury in criminal trials the right, by a general verdict, to decide both the fact and the law involved in the issue.

I am also of opinion that such an enactment, accompanied with the surrounding provisions found in this statute, as to the duties of the jury and the court, and the course of proceedings in criminal trials, is not in contravention of the Constitution of Massachusetts.

BIGELOW, J. I am of opinion that, by the true construction of *St.* 1855, *c.* 152, " concerning the duties and rights of jurors," it was the manifest intention of the legislature to change the rule of the common law, as settled by this court in *Common-wealth* v. *Porter*, 10 Met. 263 ; and that, if it was competent for the legislature to make such alteration, the language of the statute is sufficiently clear and explicit to confer on juries the right to decide questions of law involved in the issue in criminal cases, independently of and contrary to the instructions of the court. But I fully concur in the opinion expressed by the chief justice, that it was not within the constitutional authority of the legislature to confer such right on juries ; and I therefore think that the statute is repugnant to the Constitution, and so inoperative and void. Upon this ground, my judgment is, that the exceptions in the case at bar, and in all other cases pending before us in which similar instructions have been given to the jury, should be sustained, and new trials ordered.

THOMAS, J. Our first duty in relation to the statute is that of interpretation. We must clearly ascertain what power this statute gives, and the limitations and conditions under which it is given, before we can proceed to the inquiry, whether it is in conflict with the Constitution. Its general object, as its title indicates, is to define the duties and rights of juries in the trial of criminal cases. In effecting this, its general purpose, it defines the duty of the jury as to the forms and rules of law by which all criminal cases are to be tried : the power and duty of the jury in the determination of the general issue ; and the power and duty of the court.

In all trials for criminal offences, it is declared to be the " duty of the jury to try, according to established forms and principles of law, all causes which shall be committed to them." To the forms of procedure, to the rules of law regulating the conduct and course of the trial, what may be called the law of the trial, it is made the duty of the jury, in all cases, to adhere ; a duty existing before the statute, and obviously recited in it to exclude the conclusion that, in defining the power and duty of the jury in the determination of the issue of guilty or not guilty, any

new power or right was given, expressly or by implication, as to the forms of procedure or the law of the trial.

Upon the question, who is to decide what are the forms and rules of law by which the trial is to be governed, no doubt can exist. The power was clearly in the court before the statute. The constitution of the jury is such as to render the discharge of the duty by them impracticable. They have no time or opportunity for deliberation, until the cause is finally committed to them. If they had such opportunity, a difference of opinion upon any incidental matter of the trial would at once arrest its course. By the express provision of the statute, the court are to superintend the course of the trial, and to decide upon all questions of law raised during its progress. Under the statute, then, the forms of procedure and the law of the trial are with the court. In relation to these, the opinion of the presiding judge, subject to the revision of the court of last resort, is conclusive.

But the duty of the jury, to try all cases according to established principles of law, is not limited to the law of the trial, but extends as well to the law involved in the issue. The statute as clearly makes it the duty of the jury to adhere to established principles of law in the one case as in the other. Neither judges nor jury can substitute their discretion for the rules of law. The difference which the statute makes is, that, as to the law regulating the form and conduct of the trial, the opinion of the court is conclusive. In relation to the law involved in the issue, it is not.

The statute, having declared the duty of the jury to try all causes committed to them according to established rules of law, proceeds to define their duty in the determination of the issue. "Duty" is the only word used, a word which includes both power and right. What it is a man's duty to do, he has the rightful power to do. That duty is thus stated : " After having received the instructions of the court, to decide, at their discretion, by a general verdict, both the law and the fact involved in the issue, or to find a special verdict, at their election." That is to say, the duty of the jury is to do one of two things ;

to decide both the fact and the law involved in the issue, or to
find the facts specially, and leave the law to the decision of the
court. If they do not choose to do the latter, it is their " duty "
" to decide, by a general verdict, both the fact and the law in-
volved in the issue." Of the meaning of these words I can
have no doubt. " To decide " includes the power and right to
deliberate, to weigh the reasons for and against, to see which
preponderate, and to be governed by that preponderance. " By
a general verdict." That verdict, the issue of which it is the
result, the question to which it is an answer, is twofold: Is
there such a rule of law as that which the defendant is charged
with violating? Does the evidence establish the fact of such
violation by the defendant? To decide the issue by a general
verdict necessarily implies the power to decide all that is in-
cluded in that issue, and it always includes a question of law
and a question of fact. But that nothing may be left to im-
plication, however clear, or inference, however sound, it is, in
express terms, made the duty of the jury " to decide both the
fact and the law." Nor can it escape observation that the same
word, " decide," is used as to the determination of the law by
the jury and by the court. The duty of the jury is " to decide
by a general verdict both the fact and the law involved in the
issue ; " the duty of the court " to decide upon the admission
and rejection of evidence." I can see no good reason for say-
ing that, in the same clause of the statute, and upon the same
subject matter, the legislature have used the word to express
wholly different ideas; that, when used as to the court, it
means to deliberate, to weigh the reasons for and against, and
to determine ; and, when used as to the jury, it means to follow
implicitly the judgment and discretion of another. " A man,"
says Chief Justice Vaughan, in *Bushell's case*, " cannot see by
another's eye, nor hear by another's ear; no more can a man
conclude or infer the thing to be resolved by another's under-
standing or reasoning." Vaugh. 148.

Looking then to the statute itself, giving to its words their
usual, not to say obvious meaning, it seems to me plain the
statute was intended to modify the rule stated in *Common-*

*wealth* v. *Porter,* 10 Met. 263, and, under the limitations hereafter expressed, to give to the jury, in criminal causes, the " rightful " power to decide the law and the fact involved in the issue.

I use the word " rightful," in deference to the opinion of others, and to guard against mistake; never having been able myself to understand what is meant by the existence of a civil power, of which there never could be a rightful use.

The well known history of the act confirms this construction. And it is the settled usage of this court to refer to the history of legislation, to aid in its interpretation, to inquire as to the previous legislation or judicial decisions upon the same subject matter, the law as it existed before the passage of the statute, and the occasion, if any there was, for new legislation. If the statute was not intended to change or modify, in any respect, the rule settled in *Commonwealth* v. *Porter,* its enactment was but the idlest of ceremonies. Nay more, its only possible effect was to increase the difficulties in which the subject was already sufficiently involved. If, on the other hand, the object of the statute was to modify the rule, as laid down in that decision, the reason for the act becomes obvious, and its passage is found to be in conformity to a well settled practice of the general court. To say that its only purpose was to declare that the jury might return a general or special verdict, is to find in it no purpose whatever; for this right was never questioned in this commonwealth. I cannot therefore doubt the intent of the legislature in passing this act, or that their intent has been fully expressed in the language they have used.

But before we can proceed to consider the validity of this statute, the question of its conflict with the Constitution, we must carefully ascertain the conditions and limitations under which this power given to the jury exists and is to be used. Such an examination will show that the exercise of this power has been carefully guarded and limited, and that, presuming, as we are bound to do, and as experience justifies us in doing, that juries, as well as judges, will do their duty and be bound by their oaths, the anticipation of disastrous results from the statute rests on no solid foundation.

The power has existed in the jury from its first institution. It has been but sparingly used, in the main wisely and justly used. And in the light of history it may be fairly said, that in the cases (as of constructive treason, sedition and libel) in which the jury have departed from the instructions of the judge, the principle involved in the dissent of the jury has finally become the rule of the court.

The first of the limitations upon the power of the jury has already been adverted to. It is found in the provision which makes it the duty of the jury to try all cases by the established forms and principles of law; that is, by the " standing laws." The inquiry of the jury is not what is wise or expedient, not what should be, but what is the law. There is no room for individual discretion, speculation or caprice. The juror is to adhere to the law with the same fidelity as the magistrate upon the bench. He, as well as the judge, is the servant of the law he is set to administer.

Other careful limitations of this power are found in the provisions prescribing the duty of the court in criminal trials. The court are to superintend the course of the trials, and to decide upon the admission and rejection of evidence. The judgment of the court upon such admission or rejection is conclusive. Evidence offered, but excluded, can have no weight with the jury, is not the subject of consideration. Evidence admitted by the court is to have, if credible, its full weight and force, whatever the jury may think of its competency. Irrelevant and distracting matter is thus shut out from the cause, and the attention of the jury confined to the matters legally in issue. It is scarcely necessary to remark, that he who regulates the admission of the evidence sees the result and leads the way to it; that the conclusion will ordinarily follow from the proof, with a force which the honest understanding cannot resist; that upon the admission or rejection of a single piece of testimony the result of the cause will often depend.

The court are also to decide upon all questions of law raised during the trial, that is, upon all questions of law arising before and not making part of the issue. To extend the decision of

the court to all questions suggested or discussed during the trial, though involved in and making part of the issue, would bring the provisions of the statute directly in conflict, by giving to the two departments of the tribunal the power of decision upon one and the same question. But we are to adopt, upon the familiar rules of interpretation, that construction which makes the statute sensible and consistent with itself; and by "questions of law raised during the trial" we must understand questions which have reached the condition for decision during the trial, and before the cause is finally given to the jury in the charge of the court. The distinction in the statute is substantially that made by this court in the case of *Commonwealth* v. *Knapp*, 10 Pick. 477, where the court say : " Although the jury have the power, and it is their duty, to decide all points of law which are involved in the general question of the guilt or innocence of the prisoner, yet when questions of law arise in the arraignment of the prisoner, or in the progress of the trial, in relation to the admissibility of testimony, they must be decided by the court, and may not afterwards be reviewed by the jury."

In the power of the court to charge the jury, and allow bills of exception, exists, so far as the rights of the accused are concerned, another limitation upon the power of the jury. By the charge to the jury is meant the stating to them the opinion of the court upon the matters of law involved in the issue. The law presumes that the instructions of the judge will usually be regarded by the jury as the most satisfactory evidence of the law. It therefore permits the defendant to except to the charge, if it be adverse to him.

A further limitation of the right of the jury is found in the power of the court to grant new trials in cases of conviction. The judge is not only to give instructions to the jury upon matters of law; but if upon the whole case he sees the jury may have erred in matter of law against the prisoner, he is to set aside the verdict.

It may be said, that it will be impossible for the judge to say whether the error of the jury was in their judgment as to the facts, or as to the law. The objection is specious, but it is not

sound. In the first place, if the error be plain, even in matter of fact, the defendant should have a new trial. In the second place, an intelligent judge, familiar with his duties, watching carefully and at every stage the progress of the cause, can form a safe judgment whether, by a just application of the rules of law to the facts which the evidence, if believed, tends to prove, a verdict of conviction is a just result. If the judge sees the facts which the evidence tends to prove would not, in law, warrant a conviction, he should direct a verdict for the accused. If he reaches the same conclusion after a verdict of conviction has been rendered, he should set the verdict aside. If he is in doubt, he will, upon exceptions or report, reserve the question for this court.

The difficulty, which exists under the statute, exists without it. The judge cannot know, with absolute certainty, whether the jury may not have misapprehended or misapplied the instructions given them by the court. But he can arrive at a reasonable and safe conclusion upon the subject, by a comparison of the rule of law stated with the evidence; and upon that conclusion he is to act.

But this objection assumes that the fair construction of the statute is, that the jury may convict the prisoner against the clear instructions of the court on matter of law. Practically, in the ordinary administration of the criminal law, such a case would seldom, if ever, arise; for, if the facts stated in the complaint or indictment were insufficient in law to make out the offence, the indictment would be quashed on motion, or the judgment arrested. If the law had been declared invalid by the court of last resort, or if, upon exceptions, it were so declared, the same results would follow. If the facts which the evidence tended to prove did not make up all the elements necessary to constitute the offence, the judge would direct a verdict of acquittal. He would say, as to the first class of cases, No offence 's here alleged; as to the second, If all the evidence is believed, no offence is proved.

But looking even to possible contingencies, the question arises, Has the statute conferred upon the jury the right of con-

22 *

victing the prisoner against the instructions of the court in matter of law? I think it very clearly has not. If by one provision of the statute a power is given in general terms, and there is, in a subsequent part of the statute, a provision which operates as a limitation or qualification of such power, the rules of construction do not permit us to say, In the first clause a general power is given; in the second clause, a limited, qualified power; the two provisions are in conflict, and the statute is insensible or void. The result of the two provisions, judicially construed, is the grant of a qualified, limited power. We adopt precisely the same rule which is applied to the construction of a deed, devise or other contract in writing; the rule of common sense as well as of law. A grant or devise in fee simple may, by subsequent words in the same instrument, be limited to an estate for life or for years. We find first in the statute the general duty of the jury given. We then find a provision making it the duty of the court to instruct the jury in matters of law, and giving to the defendant the right to except to the instructions if they are unfavorable to him. We find that no such right is given to the prosecutor. This right of the defendant to except to the instructions of the court, existing before the statute, and carefully secured by it, would be of no value if the jury could convict against those instructions. Proceeding a step further, we find the court have the power to set aside the verdict and grant a new trial, if the jury convict against the instructions of the court in matter of law; and that no power is given by the statute to the court, or existed before it, to order a new trial for error in law, favorable to the accused. That is to say, the defendant is always to have the benefit of the instructions of the court, however favorable. The result is perfectly plain. The latter provisions qualify the former; the power granted is a limited and qualified power, a power to depart from the instruction of the court in favor of the prisoner, but not to deprive him of the benefit of those instructions.

Under the statute then, or the common law as it existed before the statute, the rightful power of the jury is but this : Having heard the evidence admitted by the court, the arguments of

counsel and the instructions of the court, if the jury cannot see, are not convinced of the existence of both elements necessary to a verdict of guilty, to wit, first, that there is such a law as the Commonwealth has charged the defendant with violating ; and, secondly, that the facts proved against him bring him within its scope and purview, they may, if they do not choose to find the facts specially, return a verdict of acquittal; a power that has always existed, and with respect to which there has been but one controversy, and that is, whether the power may be rightfully used. The effect of the statute is to declare that, in favor of the defendant, it may be rightfully used.

In criminal causes, (such is the substance and effect of the statute,) the trial shall be conducted by the judge ; all questions of law, raised during its progress, shall be conclusively determined by him ; upon the admission or rejection of evidence he alone shall decide ; he shall instruct the jury upon the matters of law involved in the issue ; but if a case arises in which, after all, the jury cannot be satisfied of the existence of the rule stated by the court, or of its application to the facts, they may so far decide against the instructions of the court as to acquit the prisoner.

If the necessary construction of the statute were to deprive the prisoner of the benefit of the instructions of the court, and to authorize the jury to convict against those instructions, I should incline to the opinion that it was invalid, because it impaired the right of trial by jury. But I have no occasion to consider this question ; for, in my judgment, such is neither the necessary, nor the reasonable, construction of the statute.

If the just construction of the statute of 1855 be that which I have given to it, we are prepared to proceed to the second inquiry Whether the legislature had authority to enact it. The whole question is as to the competency of the legislature to pass the bill. It is a question of power. We are not called upon to discuss the wisdom or expediency of the statute ; those were considerations for the legislative department solely. As a judge, I can have no opinion upon them. In the government of this commonwealth, the Declaration of Rights reminds me, the judi-

cial department shall never exercise the legislative power. Art. 30. Whether the statute is in harmony with public policy, whether it renders less certain the conviction of offenders against the laws, whether it gives to jurors a power for the exercise of which their previous training has not fitted them, are questions for the lawmaker. Before we can declare the statute void, we must see that it clearly conflicts with the provisions of the Constitution. Nor is the construction given by the legislature to the Constitution in the act itself to be overruled, unless that construction is plainly wrong. This is the settled doctrine of this court. Is the statute then plainly in violation of the Constitution?

I will not say that a statute may not be void because it is in conflict with what may be said to be the general spirit, scope and purpose of the Constitution. I must however, with great deference, say that this is an extremely dangerous and delicate ground on which to set aside an act of the legislature; in which the judicial department finds itself on the very verge of political discussion. The theories which men may form, the opinions they entertain, as to the general spirit of the Constitution, or the general purpose it was intended to effect or secure, depend very much upon the standpoint from which it is viewed. One may believe that its great purpose is to give stability to the government; another, that its great purpose is to give security to the freedom of the subject, by a system of checks and balances, which shall prevent one department from absorbing the powers of the others, and then the rights of the citizen. The truth is, all our constitutions are the results of compromise of opinion. They are written with care, to express compacts founded on mutual concession. It seems to me therefore, that no mode of construing our constitution can be more unsafe than to read its meaning in the views or opinions of any individual, however eminent, who assisted in framing it. The judicial mind must see in it a body of written laws, to be interpreted by the ordinary rules of construction, its meaning to be found in its words. The Constitution itself provides, that it shall be enrolled on parchment and be a part of the laws of the land.

We cannot seek the meaning of the laws in the opinions else-
where expressed by the legislator. We must find it in what is
written.

To declare a law unconstitutional, we must find some pro-
vision of the Constitution, which it contravenes or defeats.
Under our Frame of Government, the limitations of the legis-
lative power are in the Constitution and Declaration of Rights.
In the Constitution of the United States, we look to see if the
power is expressly given. In our own, to see if it is denied, if
any limitation is imposed.

" The general court shall forever have full power and author
ity to erect and constitute judicatories and courts of record, or
other courts, to be held in the name of the Commonwealth, for
the hearing, trying and determining of all manner of crimes,
offences, pleas, processes, plaints, actions, matters, causes and
things whatsoever, arising or happening within the Common-
wealth, or between or concerning persons inhabiting or residing
or brought within the same; whether the same be criminal or
civil; or whether the said crimes be capital or not capital, and
whether the said pleas be real, personal or mixed." " And fur-
ther full power and authority are hereby given and granted to
the said general court, from time to time to make, ordain and
establish all manner of wholesome and reasonable orders, laws,
statutes and ordinances, directions and instructions, either with
penalties or without, so as the same be not repugnant to this
constitution, as they shall judge to be for the good and welfare
of this commonwealth." " And to set forth the several duties,
powers and limits of the several civil and military officers of this
Commonwealth." Const. of Mass. *c.* 1, § 1, arts. 3, 4. In a
word, the power to establish courts of record; the power to pre-
scribe the duties, powers and limits of civil officers; the power
to make all laws not repugnant to the Constitution.

Chapter 6, art. 6, continuing in force the laws adopted in the
Province, Colony or State of Massachusetts Bay, has this quali-
fication : " Such parts *only* excepted as are repugnant to the
*rights* and *liberties* contained in this constitution."

Finding vested in the legislature the broad power to make all

laws not repugnant to the Constitution, the burden is on them who affirm that an act of the legislature is void, to show clearly the repugnancy.

Now the question is this : Can the legislature invest a jury, in a criminal trial, with the rightful power to say, by their verdict, in substance and effect, We have weighed the evidence, we have heard and considered the instructions of the court, but we cannot, on our oaths, affirm, what a verdict of guilty requires us to affirm, that there is such a law as that which the defendant is charged with violating ; or, to say, Having weighed the evidence, and considered the instructions of the court, though there is such a law, we cannot affirm, what a verdict of guilty requires us to affirm, that the defendant has violated it ?

I put the plainest possible case. The defendant is indicted for an assault and battery. He answers : " The prosecutor came to my dwelling-house with a warrant of search. I asked him to see it. I saw it was a general warrant; that there was in it no designation of the person or objects of search, arrest or seizure. I said to the officer that this warrant gave him no lawful authority for the purpose. He insisted that it did. I requested him to leave the house ; instead of so doing, he attempted to execute his warrant, and to seize my person. With such force as was necessary, and no more, I removed him from my house." The government replies, The warrant of the officer was in exact conformity to a statute of the legislature. The defendant reads the fourteenth article of the Declaration of Rights, and asks an acquittal. The presiding judge, for the purposes of the trial, instructs the jury that the act of the legislature is valid. The jury say : " The Constitution is paramount. We cannot affirm there is such a law as that upon which the government relies." It is no answer to say, that this is an improbable case. That it is not an impossible case we may conclude after the *St.* of 1852, *c.* 322, § 14, and the opinion of this court in *Fisher* v. *McGirr*, 1 Gray, 1.

That the jury have always had the " power " is conceded. The more precise question therefore is this : Can the legislature authorize the jury rightfully to use it; whether there are pro-

visions in the Declaration of Rights or Frame of Government with which such an exercise of power by the legislature conflicts ?

In the preamble of the Constitution it is averred to be the duty of a people, in framing a constitution of government, to provide for an equitable mode of making laws, as well as for an impartial interpretation and faithful execution of them. Art. 29 of the Declaration of Rights declares, that " it is essential to the preservation of the rights of every individual, his life, liberty, property and character, that there be an impartial interpretation of the laws and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit. It is therefore not only the best policy, but for the security of the rights of the people, and of every citizen, that the judges of the supreme judicial court should hold their offices as long as they behave themselves well; and that they should have honorable salaries ascertained and established by standing laws."

If the power conferred upon, or declared to exist in the jury, by this statute, impaired the rights secured by these provisions, I should of course say that the statute was to that extent void. But after the most careful consideration, I can see no such result. On the other hand, it seems to me plain, that it was with a view to secure an entire impartiality in the interpretation of the laws and administration of justice between the crown and its subject, or the State and its citizen, that the trial by jury was instituted, and has been carefully guarded and preserved.

The gist, the substance, of this trial by jury, so far as the criminal law was concerned, was this : On the trial of a subject on a criminal charge, an issue between him and his sovereign, the question of his guilt or innocence should be determined by a free, independent body of his fellowsubjects, and not by the judges or other officers appointed by the crown. This, I believe, is the right recognized and secured by Magna Carta, and which has existed for six centuries. The precise form of the tribunal, or the number composing it, or the name it first bore, is not material; thus was the substance: " No freeman shall

be taken or imprisoned, or disseized," &c., " unless by the legal judgment of his peers or the law of the land." Art. 39. " If any one hath been dispossessed or deprived by us, without the legal judgment of his peers, of his lands, castles, liberties or right, we will forthwith restore them to him." Art. 52. " If we have disseized or dispossessed the Welsh of any lands or liberties, or other things, without the legal judgment of their peers in England or in Wales, these shall be immediately restored to them ; and if any dispute arises upon this, the matter shall be determined in the marches [that is, the border districts between England and Wales] by the judgment of their peers." Art. 56. " And we will not, by ourselves or others, procure any thing [dispensation] from any person whereby any of these concessions and liberties may be revoked or lessened; and if such be obtained, it shall be null and void." Art. 61. Magna Carta of King John, Blackstone's Law Tracts, (3d ed.) xvii, xix, xxi.

Trial by jury was doubtless, under the early common law, a very different thing from that before the modern tribunal. It is probable that, at first, the trial was without the assistance of a judge. It was a jury of the vicinage, selected with reference to their knowledge of the cause, and giving their verdict as the result of that knowledge. But it had the distinctive feature which characterized the later tribunal; to wit, in an issue between the crown and the subject, the question of his guilt or innocence must be decided by an independent body of the peers of the accused. See and compare Bracton, 119, 120 ; Barrington on Statutes, (2d ed.) 18, 26, 327; 1 Palgrave's English Commonwealth, 244–248; Creasy on the English Constitution, (Amer. ed. 1856,) 188; 2 Hallam's Middle Ages, (10th ed.) 395, 405 ; 1 Spence Eq. Jur. 128, *note.* " It is," says Mr. Burke, " the very ancient privilege of the people of England, that they shall be tried, except in the known exceptions, not by judges appointed by the crown, but by their own fellowsubjects, the peers of that county court at which they owe their suit and service." Powers of Juries in Prosecutions for Libels, 5 Burke's Works, (Amer. ed. 1839,) 415.

There may be defects in a jury as a means of administering

justice; but what reconciles reflecting men to these defects is the entire freedom, impartiality and independence of the tribunal. They are selected for the office, if the laws be faithfully administered, with reference to no other qualifications but those of character and intelligence. For the particular court they are taken by lot. If any doubt exists as to their impartiality, they may be examined on oath whether they are connected with the parties, or have expressed or formed any opinion, or are sensible of any bias or prejudice. See Prov. St. 33 G. 2, (1760,) Anc. Chart. 626; *St.* 1807, *c.* 140, § 9; Rev. Sts. *c.* 95, § 27. In capital cases, the prisoner may peremptorily challenge twenty of them. For the result of their deliberations, they are responsible only to God and their consciences. They are "judges as free, impartial and independent as the lot of humanity will admit."

Whatever may be said of the relative fitness, in other respects, of judge or jury to determine the matters involved in a criminal issue, on the question of mere impartiality there can be no preference for the judge over the jury. To say nothing of the insensible effect, even upon the best of minds, which the atmosphere of a criminal court will sometimes produce, a difficulty of giving full force to the presumption of law, which holds a man to be innocent till he is proved to be guilty; this difference cannot fail to be observed; the judge can neither be examined nor challenged.

This article of the Declaration of Rights has the same great object to secure, whether a power of deciding, in favor of the prisoner, the law in criminal causes be vested in the jury or not. It is none the less essential to the preservation of life, liberty, property and character that there be judges holding their offices by permanent tenures, free and independent, that they may be impartial. The dignity and value of the judicial office are in no degree impaired; even in criminal cases their instructions would continue to be practically the guide of the jury; and in all civil causes the law is exclusively with them. Nor can we infer that the term "judges," as used in this article, does not include jurors, because the article goes on to provide that the judges of the court of last resort shall hold their offices by a

permanent tenure, and have salaries established by standing laws. On the other hand, it has been uniformly held by this court that the term "judges," in this article in the Declaration of Rights, refers to and includes jurors. See, among other cases, *Commonwealth* v. *Worcester*, 3 Pick. 471; *Commonwealth* v. *Reed*, 1 Gray, 475; *Pearce* v. *Atwood*, 13 Mass. 340.

Article 10 of the Declaration of Rights declares, that "each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws." The term "standing laws" is used some three or four times in the Constitution : in art. 29 of the Declaration of Rights, before referred to; in *c*. 2, § 1, art. 13, which provides that the governor shall have a salary "established by standing laws." What is meant by "a salary established by standing laws" seems quite plain : a salary fixed by a permanent statute or law, and not by annual appropriation, depending upon the discretion and pleasure of the legislature from time to time. So men shall hold property by standing laws, by laws not to be changed or suspended or repealed, to defeat rights vested or accruing under them. I am unable to perceive that my life or liberty is the less safe, because, in order to take from me my life or liberty, it is necessary, not only that the court should see that I have violated a standing law, but that a jury of my fellow-subjects must see it also.

Article 11 of the Declaration of Rights provides, that "every subject ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property or character." This statute cannot impair that remedy. It has nothing to do with controversies between parties, or their remedies for injuries sustained. The question of crime and its punishment is one between the government and its subject. No man has any vested right in the conviction and punishment of another. If a jury cannot be found to say that the subject he accuses or suspects of crime is guilty, he has no reason to complain. The remedy for wrong to himself, his person, property or character, rests upon different principles, is governed by different rules, which this statute in no way impairs.

Article 30 of the Declaration of Rights provides that, "in the government of this commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them ; the executive shall never exercise the legislative and judicial powers, or either of them ; the judicial shall never exercise the legislative and executive powers, or either of them ; to the end it may be a government of laws and not of men." The force of this article, if it has any application, must be found in the last phrase. If the legislative department, by this statute, has invested the jury with judicial power, it has not assumed itself to exercise the judicial power. The power, if any, conferred, is one in derogation of its own.

Is it quite plain that we are not falling into the error against which it is the object of this article to guard ? The judicial department may disturb this distribution of the great powers of constitutional government, either by itself exercising the legislative power, or by restraining that exercise, even when within the limits of the Constitution. And then, as surely as when the legislature assume judicial functions, the balance, the equilibrium of powers is disturbed. It was not the object of this article, by eloquent phrase, to indicate the character of the government the Constitution was to establish ; that is found in the frame-work itself. It was a solemn monition to each of the departments of government, of the result which would follow from transcending its peculiar sphere.

But there are other provisions in the Declaration of Rights to which we must advert. A part of art. 12 embodies the principle of art. 39 of Magna Carta : " No subject shall be arrested, imprisoned, despoiled or deprived of his property, immunities or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty or estate, but by the judgment of his peers or the law of the land. And the legislature shall not make any law that shall subject any person to a capital or infamous punishment, excepting for the government of the army and navy, without trial by jury."

Article 13, to render this trial a still greater security for the citizen, and with a keen recollection of recent events in the his

tory of the province, provides for the verification of facts in the vicinity where they happen. But the judgment of the peers and the verification of facts are not the same thing. No inference or result of facts becomes a judgment or verdict. These are the results of law and facts combined.

In the fifth article of the Bill of Rights of the Continental Congress in 1774, the provisions of the twelfth and thirteenth articles of our Declaration of Rights were combined, thus : " Resolved, *nemine contradicente*, that the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." One cannot but ask how this great, inestimable privilege of trial by peers would have been regarded, if the peers were bound to take the law implicitly from the judges appointed by officers of the crown ?

In the sixth article of the Amendments of the Constitution of the United States, the same union of the provisions is made: " In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed." Indeed, the connection is as old as the code of laws supposed to have been compiled under Henry I, 1100–1135. " *Unusquisque per pares suos judicandus est, et ejusdem provinciæ.*" See Crabb's History of English Law, 54, 55, 285.

The effect to be given to art. 12 of the Declaration of Rights must depend very much, it is true, upon what is meant by the terms, "judgment of his peers" and " trial by jury." Before proceeding to the inquiry, how these terms have been construed and understood in this commonwealth, an inquiry that, thus far, has not been pursued in the discussion of the question before us, I may be excused for throwing upon my path some of the lights of our earlier jurisprudence, for inquiring how this right of trial by jury was viewed by the earlier eminent statesmen and jurists of the country at large.

As the authority of John Adams has been invoked in this cause, I begin with him. " It was never yet disputed or doubted

that a general verdict, given under the direction of the court in point of law, was a legal determination of the issue. Therefore the jury have a power of deciding an issue upon a general verdict. And, if they have, is it not an absurdity to suppose that the law would oblige them to find a verdict according to the direction of the court, against their own opinion, judgment and conscience ? "  " The general rules of law and common regulations of society, under which ordinary transactions arrange themselves, are well enough known to ordinary jurors. The great principles of the Constitution are intimately known; they are sensibly felt by every Briton ; it is scarcely extravagant to say they are drawn in and imbibed with the nurse's milk and first air. Now, should the melancholy case arise, that the judges should give their opinions to the jury against one of these funda · mental principles, is a juror obliged to give his verdict generally, according to this direction, or even to find the fact specially, and submit the law to the court ? Every man, of any feeling or con · science, will answer, no. It is not only his right, but his duty, in that case, to find the verdict according to his own best under · standing, judgment and conscience, though in direct opposition to the direction of the court." 2 John Adams's Works, 254, 255.

These were opinions of Mr. Adams but eight years before our constitution was formed. There is no evidence, that I am aware of, that he ever changed them. There was nothing in the history of those eight years to induce a change; certainly not in the act of parliament in 1774, " for the better regulating the government of the Massachusetts Bay," by which the governor could appoint the judges, even of the superior court, without the consent of his council, to hold office during the pleasure of the king. John Adams, we may believe, could not have deemed this right of the jury fatal to " a government of laws."

In our Convention of 1788, called to act upon the adoption of the Constitution of the United States, Theophilus Parsons, in discussing the objection to the Constitution, that it had no Bill of Rights, closes with this language : " But, sir, the people themselves have it in their power effectually to resist usurpation, with out being driven to an appeal to arms. An act of usurpation is

23 *

not obligatory; it is not law; and any man may be justified in his resistance. Let him be considered as a criminal by the general government. Yet only his own fellowcitizens can convict him; they are his jury; and if they pronounce him innocent, not all the powers of congress can hurt him; and innocent they will certainly pronounce him, if the supposed law he resisted was an act of usurpation." Debates of Convention of 1788, (ed. of 1856,) 194, 195. How was this protection to be given, if the jury had no power to pass upon the question, whether the law " was an act of usurpation"? And how could Theophilus Parsons have uttered these words, unless he believed the jury had such power?

Before his death this power was exercised. The question of the constitutionality of the embargo laws was argued by Samuel Dexter to the juries in the United States courts of this district, and they refused to convict, where the evidence of the violation of the law was plenary. See 3 Bradford's History of Mass. 108, and remarks of Samuel Hubbard in Lyman's Trial, 41. I refer to these opinions and facts as matters of history only

In 1794, the case of the *State of Georgia* v. *Brailsford* was tried before the supreme court of the United States. It was an issue before a special jury. " The facts," says Chief Justice Jay, " are agreed; the only point that remains is to settle what is the law of the land, arising from those facts; and on that point it is proper that the opinion of the court should be given. It is fortunate on the present, as it must be on every occasion, to find the opinion of the court unanimous; we entertain no diversity of sentiment; and we have experienced no difficulty in uniting in the charge which it is my province to deliver." After stating the views of the court, he proceeds: " It may not be amiss here, gentlemen, to remind you of the good old rule, that on questions of fact it is the province of the jury, on questions of law it is the province of the court to decide. But it must be observed that, by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon yourselves to judge of both, and to determine the law as well as the fact in controversy. On this and on

every other occasion, however, we have no doubt, you will pay that respect which is due to the opinion of the court; for as, on the one hand, it is presumed that juries are the best judges of facts; it is, on the other hand, presumable that the court are the best judges of law. But still both objects are lawfully within your power of decision." 3 Dall. 4. The charge was by the full court, unanimous, in a civil case, where the facts were agreed.

By the sedition law of July 14, 1798, it was provided that, " if any person shall be prosecuted under this act, for the writing or publishing any libel aforesaid, it shall be lawful for the defendant, upon the trial of the cause, to give in evidence, in his defence, the truth of the matter contained in the publication charged as a libel; and the jury who shall try the cause shall have a right to determine the law and the fact, under the direction of the court, as in other cases." St. of U. S. of 1798, *c.* 74, § 3, 1 U. S. Sts. at Large, 597. If the words of the statute may be thought equivocal, there can be, I think, no doubt that the practical construction given to the act recognized and affirmed the right of the jury to pass upon the law as well as the fact. See Trial of Fries, and that of Judge Chase, *passim.*

In the trial of Fries (1800) Judge Chase thus charged the jury: " It is the duty of the court in this case, and in all criminal cases, to state to the jury their opinion of the law arising on the facts; but the jury are to decide in the present, and in all criminal cases, both the law and the facts, on their consideration of the whole case." 2 Chase's Trial, Appx. 1.

One of the grounds of the impeachment of Judge Chase was " the endeavoring to wrest from the jury their indisputable right to hear argument, and determine upon the question of law, as well as the question of fact, involved in the verdict which they were required to give." In his answer, prepared with the assistance of most eminent counsel, he denies the charge, and says: " He well knows, that it is the right of juries, in criminal cases, to give a general verdict of acquittal, which cannot be set aside on account of its being contrary to law, and that hence results the

power of juries to decide on the law as well as on the facts, in all criminal cases. This power he holds to be a sacred part of our legal privileges, which he never has attempted, and never will attempt to abridge or to obstruct." 1 Chase's Trial, 5, 34, 35.

In the case of the *United States* v. *Callender*, (also in 1800,) however, Judge Chase held that, under the third article of the Constitution of the United States, the power of determining the validity of an act of congress was solely in the judiciary.

In the trial of Henfield (1798) before Judges Wilson and Iredell of the supreme court of the United States, Judge Wilson instructed the jury, that in their general verdict they must decide both the law and the facts. In his works, Judge Wilson maintains the same doctrine. As one of the prominent framers of the Constitution of the United States, and one of our best constitutional jurists, his opinion has great weight. " Suppose," he says, " a difference of sentiment takes place between the judge and the jury, with regard to a point of law; suppose the law and the fact to be so closely interwoven, that a determination of one must, at the same time, embrace the determination of the other; suppose a matter of this description to come in trial before a jury; what must the jury do? The jury must do their duty, and their whole duty; they must decide the law as well as the fact." 2 Wilson's Works, 372, 373.

In the trial of Hodges for treason, in the circuit court of Maryland, (1815,) Mr. Justice Duvall, of the supreme court of the United States, after stating to the jury his view of the law, says " the jury are not bound to conform to this opinion; because they have a right, in all criminal cases, to decide on the law and the facts."

In the cases of the *United States* v. *Smith & Ogden*, (1806,) Judge Tallmadge, of the United States district court, said to the jury : " You have heard much said upon the right of the jury to judge of the law as well as the fact." " The law is now settled, that this right appertains to the jury in all criminal cases." " In exercising this right, they attach to themselves the character of judges, and as such are as much bound by the rules of legal decision as those who preside upon the bench." Trials of Smith & Ogden, 236, 237.

In the State of New Hampshire I find two cases somewhat later, illustrating the mode in which juries were instructed, before the recent controversy arose, though the learned court of that state have, as is well known, since decided otherwise. They are both trials before the full court. The first was that of Daniel Davis Farmer, in 1821, before Richardson, C. J., and Justices Woodbury and Green. The chief justice, in his charge, told the jury that they "were the judges both of the law and the fact;" and that "it was the duty of the court to give them proper instructions and to aid them in forming a correct opinion as to the law applicable to the case." Farmer's Trial, 68. On the trial of John Blaisdell for murder, before the same judges, in 1822, the jury were thus charged: "It behooves us to aid you in these respects, though our remarks are not binding; being yourselves, in this case, the judges of the law as well as of the facts; yet it deserves consideration, whether it will be at all safe for you to depart from those legal principles which have long been adhered to in our courts of justice, and which were derived from that country where all our legal institutions originated." Blaisdell's Trial, 54.

In 1829, Judge Prentiss, speaking for the supreme court of Vermont, said: "There is no doubt that, in criminal cases, the jury are the judges of the law as well as the fact. This is the true principle of the common law, and it is peculiarly appropriate to a free government, where it is unquestionably both wise and fit that the people should retain in their own hands as much of the administration of justice as is consistent with the regular and orderly dispensation of it, and the security of person and property." *State* v. *Williams*, 2 Verm. 488, 489.

I would refer also to the opinion of Judge Kent, in the case of *The People* v. *Croswell*, (1804,) 3 Johns. Cas. 337, as containing a full exposition of this view of the law; contenting myself with two brief extracts from a case so familiar to the profession. "In every criminal case, upon the plea of not guilty, the jury may, and indeed they must, unless they choose to find a special verdict, take upon themselves the decision of the law, as well as the fact, and bring in a verdict as comprehensive as the issue."

" The exercise of this power in the jury has been sanctioned, and upheld in constant activity, from the earliest ages." 3 Johns. Cas. 366, 368.

These citations speak, I believe, the general opinion of our early jurists. They show that, if this doctrine as to the right of the jury be an error, it is, in this country at least, an old one, the error of many of our wisest and most conservative judges and statesmen. It will not escape observation 'that I have cited from no others.

I proceed to inquire how the law has been understood and " practised on" in this commonwealth; and with this view, to advert, first, to some of the usages and practices of our courts; secondly, to the legislation upon the subject from the settlement of the colony; and, thirdly, to the cases in this court, in which the subject has been considered.

The first fact, and an almost conclusive one, which strikes us in this investigation is, that, until a quite recent period, jury trials, in important criminal causes, were had before the full bench of this court; that in those trials it was not only the right, but the practice, of the judges to charge the jury *seriatim ;* and that it was not an infrequent occurrence that the judges entertained different views of the law, and stated and enforced those views to the jury. It is obvious that, in these cases, the jury could not have taken the law implicitly from the court, but that such a practice was consistent only with a right in the jury to consider and decide the law. The same thing might still occur in capital trials, which are held only by a full court.

Another fact is, the long well settled usage, in the Commonwealth and in the Province, in criminal trials, for counsel to read authorities and argue fully questions of law to the jury; a usage which can be predicated only on the right of the jury to consider and weigh what was argued; counsel having no legal right to address an argument to a tribunal that cannot hear and determine.

The difference in the forms of the oaths administered in criminal and civil causes is another fact indicating a difference in the nature of the duty to be discharged. These forms, with

slight variation, have been in use in Massachusetts since 1692. The oath directed by *St.* 4 W. & M. *c.* 17, in criminal cases, was: " You shall well and truly try and true deliverance make between our sovereign Lord and Lady the King and Queen and the prisoners at the bar, whom you shall have in charge, according to your evidence." As now modified, in ordinary criminal cases, it is: " You shall well and truly try the issue between the Commonwealth and the defendant, according to your evidence." In a capital case : " You shall well and truly try and true deliverance make between the Commonwealth and the prisoner, whom you shall have in charge, according to your evidence." In civil causes, the form is precisely that prescribed in 1692 : " You swear that, in all causes between party and party that shall be committed to you, you will give a true verdict therein according to the *law* and *evidence given* you." *St.* 1807, *c.* 140, § 14. Rev. Sts. *c.* 137, § 7. In the civil case, the juror is to return a verdict which is the result of the law and evidence given him. In the criminal case, he is well and truly to *try* the *issue* between the Commonwealth and the defendant, an issue involving, in its very nature, law and fact. In a capital case, the difference is made more emphatic. He is well and truly to *try* and true *deliverance* make between the Commonwealth and prisoner whom he has in charge.

The form of committing the cause to the jury is also quite significant: " To this indictment, gentlemen, the prisoner at the bar has pleaded not guilty, and for trial has put himself upon his country, which country you are. You are now sworn to try the issue. If he is guilty, you are to say so ; if he is not guilty, you are to say so, and no more."

In our colonial history, trial by jury appears to have been as inartificial as in the earlier periods of the common law. In the Colony Laws, we find the following provisions upon the sub ject:

" All freemen called to give any advice, vote, verdict or sentence in any court, council or civil assembly, shall have full freedom to do it according to their true judgment and conscience, so it be done orderly and inoffensively for the manner." Body

of Liberties of 1640, art. 70; Mass. Colony Laws, (ed. of 1672,) 153 ; Anc. Chart. 200.

" In all cases wherein the law is obscure, so as the jury cannot be satisfied therein, whether it be grand or petit jury, they have liberty to present a special verdict, namely, if the law be so in such a point, we find for the plaintiff; but if the law be otherwise, we find for the defendant; in which case the determination doth properly belong to the court." " If the court and jury shall so differ at any time about their verdict, that either of them cannot proceed with peace of conscience, the case shall be issued and determined at the next court of assistants." " It is further ordered, that whensoever any jury or jurors are not clear in their judgments or conscience, concerning any case wherein they are to give their verdict, they shall have liberty in open court (but not otherwise) to advise with any man they shall think fit to resolve or direct them, before they give in their verdict." Mass. Colony Laws, (ed. of 1672,) 87 ; Anc. Chart. 145 ; Washburn's Judicial History of Mass. 44, 45, 47 ; Body of Liberties, arts. 31, 76.

These provisions are crude and inartificial; but they show how this matter of the right of the jury was early understood, and that the doctrine, that the instructions of the court in matters of law were conclusive upon the judgment and conscience of the jury, had no foothold in the colony.

It is believed that, from the Province Charter of 1692 to the adoption of our constitution in 1780, no act was passed, in any manner affecting the right of the jury in criminal cases. The edition of the Perpetual Laws of 1759, with the supplements, has been examined, and also all the acts from that time to the 25th of October 1780. Nor does it appear from the journals that the subject was ever agitated in the general court. The act of 4 W. & M., " setting forth general privileges," passed at the October session of 1692, (Anc. Chart. 214,) was disallowed by the king in privy council.

At what time then was the rule, by which the court is to decide exclusively and conclusively the law in criminal cases, so adopted, used and approved in the colony or province, as to bring

it within the sixth article of chapter six of the Constitution, which provides that " all the laws, which have been *heretofore* adopted, used and approved in the Province, Colony or State of Massa-chusetts Bay, and *usually practised on* in the courts of law, shall still remain and be in full force, until altered or repealed by the legislature ; such parts only excepted as are repugnant to the rights and liberties contained in this constitution ? "

Since the adoption of the Constitution there has been but a single act of legislation upon the subject, and that is in the stat-ute of 1807, *c.* 140, § 15, which affirms the right of the jury in the following terms : " It shall be the business of the traverse and petit juries respectively to try, according to the established forms and principles of law, all causes which shall be committed to them, and to decide, at their discretion, by a general verdict, both the fact and the law involved in the issue; or to find a special verdict," &c. This act was in force from 1808 to 1836, when the revised statutes were adopted. We are not aware that the constitutionality of the act was ever brought in ques-tion ; nor have we found a criminal case in which the jury were instructed otherwise than in conformity to it. The report of the commissioners gives no reason for not including this section in the revised statutes. It does not allude to the subject. It is difficult to account for this entire silence except upon the ground, that the section recognized a familiar rule, and one which needed no legislation to affirm it.

I will now, as briefly as I may be able, examine the opinions and decisions of this court upon the subject. In the course of such examination as my other engagements have permitted me to make, two or three cases have fallen under my notice, not contained in the regular reports, but trials before the full bench, and carefully reported ; the law stated in which has the usual force of legal precedent. See *Webster* v. *Commonwealth*, 5 Cush. 394.

In the trial of Henry Phillips for the murder of Dennegri, (1817,) the court was held by Chief Justice Parker and Justices Jackson and Putnam. In the charge to the jury, Parker, C. J. says : " You are told that you are judges of the law and the evi-

dence. Practically you are so; that is to say, a general verdict of guilty, or not guilty, embraces a decision upon the facts, and the law applicable to those facts. But you will not differ from the opinions and decisions of wise and learned men, as reported in our books of law, nor from the direction of the court. The responsibility in regard to the law rests upon the court." Phillips's Trial, 15. These instructions, if not in terms, in substance affirm that the jury may decide the law against the instructions of the court; they are wholly inconsistent with the idea that the jury shall take the rule implicitly from the court, and conform their verdict to it. The jury are told that a general verdict embraces a " decision upon the facts and the law;" that they will probably be governed, not exclusively by the court, but by the opinions of wise and learned men reported in our books of law, and by the direction of the court. It is added indeed that the responsibility in regard to the law rests upon the court. The fact, that the jury may acquit the prisoner against those instructions does not relieve the court from that responsibility; as the court well remark in *Commonwealth* v. *Knapp*, 10 Pick. 496.

If the right of the jury is not fully and clearly affirmed in *Commonwealth* v. *Phillips*, we have a more explicit declaration of it in a most interesting cause of the year preceding.

In the well known case of *Commonwealth* v. *George bowen*, for murder, by advising and inducing a fellowprisoner to the commission of suicide, carefully reported by a member of the bar, (from whose report the law in 13 Mass. was extracted by Mr. Tyng,) the court, consisting of Chief Justice Parker and Justices Jackson and Putnam, instructed the jury as follows: " In all capital cases, the jury are the judges of the law and fact. The court are to direct them in matters of law; and although it is safer for them to rely on the instructions derived from that source, still, gentlemen, *they are to decide for themselves.*" In conclusion, the court carefully repeat the statement: " Gentlemen, you are *judges of law and fact.* You will probably ground your verdict upon the direction of the court in regard to the law, though you are allowed to return a general verdict." Bowen's Trial, 51, 56. See also p. 52.

These instructions are from the court of last resort. They are, it seems to me, irreconcilable with the more recent doctrine. Yet, it is to be borne in mind, the question we are now discussing is not whether, by the common law practised on in our courts, the jury may decide for themselves the law involved in the issue of guilty or not guilty; but whether it is competent for the legislature to invest them with such power by any statute, however explicit.

In the case of *Commonwealth* v. *Lyman*, for a libel, in 1828, Chief Justice Parker, in his charge to the jury, said: " Each case stands almost independently of every other, depending upon the facts or circumstances which belong to it; and hence the principle now universally acknowledged in this country and in England, that the jury, who are a selection from the people, shall determine the whole case, both as to law and fact, by a general verdict of guilty, or not guilty, unless they choose to refer the matter of law to the court, in the form of a special ver dict. There have been great controversies upon this subject, and the highest order of talents exercised upon it. Until quite a recent period in English history, the judges arrogated to themselves the right to determine the criminality of an alleged libel, leaving to the jury the power only of finding the fact of publishing, and the truth of the innuendoes. But in the late reign of George III, by an act of parliament, the whole power of determining the facts and law has been vested in the jury. I believe that was always the law with us; it certainly is now. It never could have been otherwise in practice, whatever might be the theory ; for the jury have always had the right to return a general verdict, which involves both law and fact; and when there was an acquittal, there was no power in the court to suspend or defeat their verdict." Lyman's Trial, 67.

In the case of *Commonwealth* v. *Child*, in 1828, Mr. Justice Morton said: " In prosecutions of this kind, it is true the jury are judges both of the law and the fact, though in civil suits it is otherwise." Child's Trial, 90.

In the case of *Commonwealth* v. *Snelling*, as late as 1833, Mr. Justice Putnam said to the jury: " In civil cases, the judge

declares the law; but in criminal cases, you have the power of determining the law as well as the fact." Snelling's Trial, 75. See also the charge of the same judge in *Commonwealth* v. *Knee-land*, in 1834.

I will now advert to the cases in our reports, where the right and power of the jury have been the subject of remark or decision. In *Coffin* v. *Coffin*, 4 Mass. 25, in 1808, an action for slander, Chief Justice Parsons said: " Both parties had submitted the trial of this issue to a jury. The issue involved both law and fact, and the jury must decide the law and the fact. To enable them to settle the fact, they were to weigh the testimony; that they might truly decide the law, they were entitled to the assistance of the judge. If the judge had declined his aid in a matter of law, yet the jury must have formed their conclusion of law as correctly as they were able." This even in a civil case.

*Commonwealth* v. *Blanding*, 3 Pick. 304, in 1825, was an indictment for a libel. At the trial, before Mr. Justice Wilde, the jury were instructed, " that the malicious intent charged in the indictment was an inference of law, it not being competent for the defendant to prove the truth of the facts alleged, and there being no such proof in the case; and that, although the jury were, with the advice of the court, the judges of the law and the fact, yet they were bound to decide according to the law as actually established, whatever might be their opinion of its policy; and that, unless they knew the law to be otherwise, they ought to receive it from the judge, whose instructions, if incorrect, would be subject to revision by the whole court." It may be worth remarking, that Attorney General Morton, of long experience in his office, said, in his argument in that cause, " it had never been denied in this commonwealth that the jury had the right to determine the law and the fact on an indictment for a libel."

In the case of the *Commonwealth* v. *Knapp*, 10 Pick. 477, in 1830, a written confession of the prisoner had been, upon full consideration, admitted in evidence. It was argued to the jury, by the eminent counsel for the prisoner, that they were judges of the law as well as the evidence in capital cases, and that they ought to reject the confession of the prisoner as incompetent evi-

dence, notwithstanding the court had admitted it. The court said: " The proposition, that the jury are judges of the law as well as the fact, is not true in its broadest sense. It requires some qualification. As the jury have the right, and, if required by the prisoner, are bound to return a verdict of guilty or not guilty, they must necessarily, in the discharge of their duty, decide such questions of law as well as of fact as are involved in this general question; and there is no mode in which their opinions upon questions of law can be reviewed, by this court or by any other tribunal. But this does not diminish the obligation of the court to explain the law, or their responsibility for the correctness of the principles of law by them laid down. The instructions of the court, in matters of law, may safely guide the consciences of the jury, unless they *know* them to be wrong. And when the jury undertake to decide the law (as they undoubtedly have the power to do) in opposition to the advice of the court, they assume a high responsibility, and should be very careful to see clearly that they are right. Although the jury have the power, and it is their duty to decide all points of law which are involved in the general question of the guilt or inno-cence of the prisoner, yet when questions of law arise in the arraignment of the prisoner, or in the progress of the trial, in relation to the admissibility of evidence, they must be decided by the court, and may not afterwards be reviewed by the jury." 10 Pick. 495.

I assent to the law as here stated. I see the most full and striking concurrence between it and the statute of 1855. The court say not only that the jury have the power, but that it is their duty to decide all points of law which are involved in the general question of the guilt or innocence of the prisoner. They draw the distinction, which the statute draws, between questions of law involved in the issue, and those arising in the arraign-ment of the prisoner, or in the progress of the trial. They say indeed that the instructions of the court, in matters of law, may safely guide the consciences of the jury, unless they know them to be wrong; that, in deciding the law in opposition to the advice

24 *

of the court, the jury assume a high responsibility, and should be very careful to see clearly that they are right.

It may well be doubted how safely one branch of the tribunal can determine what shall guide or satisfy the " consciences " of the other.   What has become a question of conscience must be settled in the " interior forum," according to the honest convictions of a man's understanding, upon the evidence before him.

The word " know " is of course used with reference to the subject matter.   There can be no absolute knowledge of that which is the result of reasoning and evidence.   No judge can " know " that he is right.   The court can only mean, if the jury are firmly convinced, if they " see clearly that they are right," they may decide against the advice of the court.

In the case of *Commonwealth* v. *Kneeland,* 20 Pick. 206, the report states that, at the trial, the defendant admitted the writing and publishing of the libel, and the questions submitted to the jury were, whether the publication was in violation of the *St.* of 1782, *c.* 8, and *whether that statute was constitutional?* 20 Pick. 208.   Mr. Justice Wilde, in his charge to the jury, used this language : " Although it is true that you have a right to decide the law as well as the fact, in this and every criminal case, where the trial is on the general issue, and are indeed bound to do so by the forms of the issue, yet in cases of doubt and difficulty you will look to the court for instructions as to the law, throwing upon that tribunal the responsibility of deciding it correctly." Review of Kneeland's Trial, by " Cosmopolite," 25.   The right and power of the jury do not appear to have been drawn in question, but in the very able and carefully drawn opinion of the court we find these words : " In criminal cases, by the form in which the issue is made up, the jury pass upon the whole matter of law and fact.   It is the duty of the judge to give such instructions, in matters of law, as, in his judgment, may be best calculated to aid and assist them in forming their verdict."   20 Pick. 222. I may also refer to the very able dissenting opinion of Mr. Justice Morton, who affirms that a case may arise where it would be the duty of the jury to regard an act of the legislature as void.   20 Pick. 227.

Such is the tenor of the instructions of this court. Nor am I aware of any case in this court, since the adoption of the Constitution, that is in conflict with them, before the case of *Commonwealth* v. *Porter*, 10 Met. 263. I cannot say that a case does not exist, but only that, if it does, it has escaped my attention.

When, in 1845, the case of *Commonwealth* v. *Porter* came before this court, the right of the jury to decide, in criminal cases, the law and the fact involved in the general issue was not, I submit, in the light of the legislation, the practice, and the judicial decisions of this commonwealth, an open question. Wisely or unwisely, the rule was settled, practised on at *nisi prius*, and repeatedly recognized and affirmed by the full court.

The result of the reasoning in the case of *Commonwealth* v. *Porter*, however, is, that the jury are in all cases to receive the law from the court, and to conform their judgment and decision to it. " The result of the reasoning ; " for the case, it seems to me, treats the matter as one of abstract reason and speculation. It omits to consider what have been the practice and usage of our courts. The question, we cannot be too often reminded, was not an original one. It was not whether a division of power, by which, in criminal trials, the court only should decide the law and the jury the facts, gave to the system greater symmetry, worked out a more perfect theory ; but what was the right of the citizen under the common law, as " usually practised on " in Massachusetts.

As matter of theory, the system of trial by jury is open to much criticism ; but practically, and in the long run, it works well. The subject has found his safety in it. His common law rights have grown out of it, and been secured by it. It is, in fact, the conservative power of a free government. It conserves its freedom. I may not here pursue this topic. See, among other works, Montesquieu's Spirit of Laws, Bk. 11, *c.* 6 ; De Lolme on the English Constitution, (Amer. ed. of 1792,) 136, 137, who affirms this right of the jury in the most explicit terms ; Lord John Russell's Essay on the English Constitution, 392–394 ; 4 Inst. 40, 41 ; The Englishman's Right, by Sir John Hawles, first published in 1681, reprinted by Edes & Gill,

Boston, 1772, and containing an able vindication of the rights of the jury; Lord Somers, Essay on Grand Juries, 1681.

The law is indeed a science, a complicated science; its range as wide as that of human interests and passions. To administer it wisely, a man must give to it the strength of life. It seems therefore anomalous, at first view, that men coming from the ordinary pursuits of life, and with no previous training, should be called upon to decide questions of law. But reflection relieves, if it does not remove the difficulty. In the first place, it is conceded that the jury must take the law and apply it to the facts. To do this intelligently and justly, they must, to some extent, understand it.

Again: almost every criminal cause is found upon investigation, and when stripped of irrelevant matter, to hinge upon two or three points, which a jury of sensible men can be made to understand.

In criminal trials, the motives and intent of the actor are so closely interwoven with, and so qualify and make part of the thing done, and the legal result is so connected with and dependent upon them, that a mode of trial, in which the judgment of the jury could not be had on matters of law, would be impracticable.

The criminal law, though in former times it might be justly said of it, *quæ lex quæsita ab omnibus, ignorata a multis, cognita a paucis,* is now comparatively certain and easily understood. Difficult questions arise, but they are the exceptions rather than the rule; and experience shows that, in these cases, the jury readily defer to the instructions of a learned and upright judge.

But if a case should arise in which the existence or validity of a law is so doubtful that a jury cannot be found to affirm it, or its meaning and purpose so uncertain that they cannot understand it, will not the question involuntarily suggest itself, How could the accused be expected to do so? With respect to offences *mala in se,* the difficulty does not occur; with respect to those prohibited, only when the extreme limit of authority is reached, if not passed.

To return to the case of *Commonwealth* v. *Porter:* While the

general reasoning of the case tends to the conclusion, that the jury ought to have no rightful authority to decide matters of law, there is a statement of what seems to me the law of this statute, so clearly and forcibly made, that I may be pardoned for quoting it : " In every charge of crime, there must be a question of law and a question of fact, to wit, Is there any such rule of law as that on. which the indictment is founded ? Has the defendant done the acts charged in the indictment, which amount to a violation. of such rule of law, and constitute the offence charged ? The decision of both of these is necessarily involved in a verdict of ' guilty' or ' not guilty.' The former affirms that there is such a law, and that the accused has violated it ; the latter affirms, either that there is no such rule of law, or, if there is, that the accused has not done any acts which amount to a violation of it." 10 Met. 282.

If the verdict of guilty involves the decision, that there is such a rule of law as that on which the indictment is founded ; if it affirms the existence of such a rule ; can it, I respectfully submit, be said the jury have no right of judgment upon that which their verdict decides, and on oath affirms ? The moment it is conceded that the verdict of the jury is an affirmation or denial of the existence of the rule of law, the right of deliberation upon the question of its existence begins. The mind cannot be called upon to affirm or deny, nay more, it is incapable of affirming or denying the existence of a moral truth, about which it cannot exercise the reason and judgment. It is quite immaterial what is the word used ; " decide," " pass upon," or " affirm ;" the mind does none of these when it takes the rule implicitly from another.

Not only does this right of deliberation seem to be .conceded ; but the permitting of the reading of the reports of adjudged cases and other legal authorities, and of comments of counsel upon them, would seem to be with no other view than to aid the jury in such deliberation.

This right to argue questions of law to the jury in criminal cases was decided not only in conformity to the settled usage, but upon the force and authority of that usage, upon the com-

mon law of Massachusetts. " Such address to the jury," say the court, " upon questions of law embraced in the issue, is warranted by the long practice of the courts in this commonwealth in criminal cases ; in which it is within the established authority of the jury, if they see fit, to return a general verdict, embracing the entire issue of law and fact." 10 Met. 287. I cannot but think, if the question as to the rightful power of the jury had been determined upon the same grounds, the same result would have been reached.

With this evidence before us of what has been understood to be the rule in this commonwealth, and of its repeated recognition by this court, we are prepared, I think, to give a practical answer to the suggestion, that the existence of such a right in the jury would be inconsistent with a government of laws. That answer is the history of the Commonwealth. Indeed the history of the trial by jury, both in England and our own country, shows that this right to pass upon the law by a general verdict has, when most clearly recognized, been regarded as a sort of reserved power, sparingly used, and with deference to a discreet and learned bench ; most used, when most questioned and denied.

But admitting, for the argument's sake, the law as to the right of the jury to have been uncertain, and to have been brought in question, the general court, in declaring what was the common law on that subject, were but using a legislative power familiar in the history of England and of our own commonwealth.

I should have been content to leave the question before us on these two grounds : 1st. That the statute of 1855 is only a declaration of the common law as practised on in Massachusetts ; 2dly. That if, in favor of the accused, it has invested the jury with additional power, it is not repugnant to the Constitution.

The question, in my judgment, is one of domestic law and history, What the people of the Massachusetts Bay understood by trial by jury, when they secured it by their constitution ? The answer to this question is to be found in the legislation, usages and practice of the Colony, Province and Common-

wealth, from the first provision in the Body of Liberties, in 1640, to the decision of *Commonwealth* v. *Porter,* two centuries later. If I am right as to the rule usually " practised on " in Massachusetts, it is of little practical moment to inquire what was the common law of England at the time of our separation. The law we, as a commonwealth, adopted, was the common law of England, as modified by our own usages and practice.

But the question has usually been discussed as if the only inquiry was, What was the rule in England when our constitution was framed ? I think it was the rule declared by this statute ; that the weight of authority is that way. I shall content myself with a brief view of the subject, adverting only to some of the leading authorities, because it is not the main question before us, and because of the length to which these remarks have already been extended.

As before stated, (*ante,* 264,) juries were originally selected from the vicinage, for their presumed knowledge of the cause, and, in civil and criminal cases, passed upon the whole matter of law and fact. All controversies were settled by the " judgment of the peers." The house of lords, trying a peer upon a criminal charge, exercise, to-day, the power and right to pass upon the whole issue of law and fact, which were originally exercised by the people, as the peers of the county court at which they owed suit and service.

As the subjects of property multiplied, and the rules which regulated it became more complicated, the law in civil cases passed, by slow stages, into the hands of the court. By the introduction of special pleading, questions of law were raised upon the record. By special verdicts, the same result was reached ; the law was separated from the facts. But upon general issues, involving law and fact, the right of the jury to pass upon the whole matter continued for several centuries, even in civil cases. As matter of history, this is clear.

About the year 1261, Bracton writes : " *Videtur tamen quod aliquando pertinet judicium ad juratores, cum super sacramentum suum dicere debent (dum tamen secundum conscientiam) si talis disseysiverit talem vel non disseysiverit, et secundum hoc reddatur*

*judicium:* " It seems nevertheless that judgment sometimes belongs to the jurors, since upon their oath they must say (yet only as their conscience allows) if such an one has disseized another or not, and according to this the judgment will be rendered.   Bract. 186.

For a false verdict, in civil cases, juries were early made liable to a process of attaint, brought by the party against whom a verdict had been rendered ; by which the cause was tried again by a jury of twenty four, and if the first verdict was found false, it was set aside, and the first jury subjected to severe punishment.   Having acquired the power to return special verdicts, they were desirous of using that power to escape the responsibility incurred by returning a general one involving both law and fact.   This course however did not satisfy the judges.   " Some judges," says Coke, " did rule over the recognitors [jurors] to give a precise or direct verdict without finding the special matter."   2 Inst. 422.

To relieve jurors from this unreasonable pressure of the court, the statute of Westm. 2, *c.* 30, (1285,) was passed.   It provided that the justices assigned to take assizes shall not compel the jurors to say precisely whether it be disseizin or not, so they do show the truth of the fact, and pray the aid of the justices ; but if, of their own choice, they will say [*si sponte velint dicere*] it is disseizin, or not, their verdict shall be admitted at their own risk [*sub suo periculo*].   That is to say, the jury may return the facts specially, or they may return a general verdict involving law and fact ; but if they do the latter, they must do it at the risk attaching to such verdict, to wit, liability, if false in law or fact.   They had the power to return a general verdict. Such a verdict involved both law and fact.   They were not liable for the use of the power, but for the wrongful use.   Littleton (1477) affirms the same right.   " If they [the jurors] will take upon them the knowledge of the law upon the matter, they may give their verdict generally, as is put in their charge , as in the case aforesaid they may well say, that the lessor did not disseize the lessee, if they will."   Lit. § 368.   This entirely agrees with the view I have expressed of the *St.* of Westminster.   The jury

may return a general verdict, if they will assume the responsibil-ity which attaches to deciding both law and fact. This is made quite clear by the comment of Lord Coke in 1628. " Although the jury, if they will take upon them (as Littleton here saith) the knowledge of the law, may give a general verdict, yet it is dangerous for them so to do, for if they do mistake the law, they run into the danger of an attaint; therefore to find the special matter is the safest way where the case is doubtful." Co. Lit. 228 *a.* See note of Mr. Hargrave to Co. Lit. 155 *a*, to the same point.

In the 22d of Charles II. (1662) Chief Justice Vaughan says : " In special verdicts, the jury inform the naked fact, and the court deliver the law." " But upon all general issues ; as upon *not culpable* pleaded in trespass, *nil debet* in debt, *nul tort, nul dis-seizin* in assize, *ne disturba pas* in *quare impedit.* and the like ; though it be matter of law whether the defendant be a trespasser, a debtor, disseizor or disturber, in the particular cases in issue ; yet the jury find not (as in a special verdict) the fact of every case by itself, leaving the law to the court ; but find for the plaintiff or defendant upon the issue to be tried, wherein they resolve both law and fact complicately, and not the fact by itself; so as, though they answer not singly to the question, What is the law ? yet they determine the law in all matters where issue is joined and tried in the principal case, but [except] where the verdict is special." Vaugh. 149, 150.

He cites in affirmation Lord Chief Justice Hobart, who, in *Needler* v. *Bishop of Winchester*, Hob. 227, says : " Legally it will be hard to quit a jury that finds against the law, either common law, or general statute law, whereof all men were to take knowledge, and whereupon verdict is to be given, whether any evidence be given to them or not. As if a feoffment or devise were made to one *in perpetuum*, and the jury should find cross either an estate for life or in fee simple, against the law, they should be subject to an attaint, though no man informed them what the law was in that case."

A limitation of this liability is stated by Lord C. J. Vaughan. He says : " Following the direction of the court barely [in mat-

ter of law] will not bar an attaint; but may excuse the jury from the forfeitures." Vaugh. 145.

In 1681, Lord Somers says: " As it hath been the law, so it hath always been the custom and practice of these juries, upon all general issues, pleaded in cases civil, as well as criminal, to judge both of the law and the fact." Essay on Grand Juries, 9, 10

The *decantatum,* " *Ad quæstionem facti non respondent judices, ad quæstionem legis non respondent juratores,*" is, rightly understood and with proper limitations, true. It is not however true that the province of the jury is exclusive, as to fact, and that of the court, as to law, even in civil cases. Courts set aside verdicts, because against the evidence or the weight of the evidence. In suits for libels, juries pass upon questions of law as well as fact. In *Baylis* v. *Lawrence,* 11 Ad. & El. 920, it was held no misdirection for Lord Abinger to have said to the jury : " I own I find a difficulty in saying whether it is a libel or not Gentlemen, can you assist me ? " To questions of pure law, raised by demurrer, or on special facts found or agreed, the court only respond; to questions of pure fact, the jury. But, to that other class of questions, of law complicated with fact, as it always is in a general issue, these authorities show, it seems to me, that for four centuries at least after that statute of West-minster, the jury responded, unless they chose to find a special verdict and pray aid of the court.

That the law upon this subject has been changed I have no doubt, though it may be difficult to say at what precise time the change took place; much more recently, however, than is generally supposed. It is now however the settled rule, that in civil cases, except actions for libel, the decision of the law is with the court.

But in criminal cases, and for the soundest of reasons, the result has been different.

The court was the king's court, in which he sat in person, or by his delegate. In a question between two of his subjects, the king or his judge was presumed to be indifferent. To criminal causes the king was a party. They were pleas of the crown ; issues between the crown and his subject. The jury

of peers were the judges between the crown and the subject. " The *pares*," says Bracton, " were necessarily the judges in all cases of life, limb, crime and disherison of the heir *in capite*. The king could not decide; for he would have been both prosecutor and judge. [The old Latin is emphatic, " *quia esset in querela propria actor et judex.*"] Neither could his justices, for they represent him." Bract. 119.

If he or his judges could decide the law, it is plain that it would be quite immaterial who should decide the facts. History shows, by the saddest lessons, that there are no facts out of which constructive treason, conspiracies, sedition or libel cannot be made. The only safety of the subject was in the judgment of his peers upon the whole issue.

We find therefore that the rules of special pleading do not obtain in criminal causes. No issue of law can be raised upon the record to conclude the defendant, unless he raise it. He has the right to go to the jury upon the whole question of guilt or innocence. The verdict of not guilty is conclusive; from it there is no appeal, for it no remedy. For the verdict, in a criminal cause, however erroneous, no attaint laid. When Erskine cited the authority of *Bushell's case* to that effect, Lord Mansfield said : " To be sure it is so." 21 State Trials, 980. No fine can be imposed for the discharge of his duty in rendering the verdict; the juror is in law wholly irresponsible.

This power of absolute discharge and deliverance of the prisoner, upon the whole issue of law and fact, has existed now for six centuries; it has been used to defeat the crown in its most cherished purposes; it has continued without change. To say that a power of last resort, for the undue exercise of which there is no remedy, was never meant to be used, that it can never be rightfully used, seems to me, with all respect, a contradiction in terms. " The true criterion," says Judge Kent, " of a legal power is its capacity to produce a definitive effect, liable neither to censure or review." *People* v. *Croswell*, 3 Johns. Cas. 368. " Where," said Alexander Hamilton, *arguendo*, " the law allows an act to be valid and definitive, it presupposes a legal and rightful authority to do it. This is a sure and infallible test

of a legal power." 3 Johns. Cas. 355. See also Erskine's Argument, 21 State Trials, 980.

Every legal power is capable of being abused, but it is also capable of being rightfully used. It is a civil power; and civil power and civil right are convertible terms. To say, the power cannot be used, is to say it does not exist. When it is said, therefore, that this is a power without right, that the jury have the like power to return a verdict against the evidence, the answer is plain, There is no legal power to return a verdict against the evidence. It can never be rightly used. It is in direct conflict with the sworn duty of the jury.

So when Blackstone says, in 4 Com. 361, that the jury "have an unquestionable right of determining upon all the circumstances, and finding a general verdict, if they think proper so to hazard a breach of their oaths," the obvious inquiry is, What oath? The obligation is to a faithful discharge of duty—well and truly to try the issue. It is surely an obvious abuse of terms to talk about the "unquestionable right" of violating an oath.

· The last feature, wholly distinguishing trial by jury in criminal from that in civil causes, was that, as to the higher class of offences, affecting life or limb, the defendant could not be put upon his trial except with the consent of another body of his peers, the grand jury. "For this purpose," says Lord Somers, and there is no higher constitutional authority in English jurisprudence, "it is made a fundamental in our government, that (unless it be by parliament) no man's life shall be touched for any crime whatsoever, save by the judgment of at least twenty four men; that is, twelve or more to find the bill of indictment, and twelve to give the judgment upon the general issue of not guilty joined." "The other twelve, in commoners' cases, are called the petit jury." "The office and power of these juries is *iudicial*;" [The italics are in the original.] "they only are the judges from whose sentence the indicted are to expect life or death; upon their integrity and understanding the lives of all that are brought into judgment do ultimately depend; from their verdict there lies no appeal; by finding guilty or not guilty, they do

complicately resolve both law and fact." Essay on Grand Juries, 8, 9.

If this legal power once existed in the jury, if it has been used for ages, the burden is on them who assert that it has been taken away, to show it; and this either by some act of parliament, or by a course of uniform precedents, generally acquiesced in.

In *Bushell's case*, before referred to, the rights of juries were elaborately considered. It was *habeas corpus* to bring up the body of Bushell, who had been fined and imprisoned for determining the cause of *Mead & Penn*, as the return to the writ stated, " against full and clear evidence, and against the direction of the court in matter of law." The question was, whether the imprisonment was legal. It was decided that it was illegal; that a jury could not be punished for rendering a verdict against the direction of the court in matter of law, or against evidence. It was also held that, in criminal cases, attaint did not lie. Lord Chief Justice Vaughan discusses the matter quaintly, but fully. Upon careful reading of the case, I think the clear result of the reasoning is to show, that the power of determining questions of law on the general issue was in the jury. I am confirmed in this view by the contemporary opinion of Lord Somers, in the work before cited, 10; by Lord Erskine, in his argument in the king's bench upon the rights of juries, 21 State Trials, 991, 992; and by Judge Kent, in *The People* v. *Croswell*, 3 Johns. Cas. 370.

Having considered the ground of the verdict being against evidence, Lord Chief Justice Vaughan proceeds to the allegation of the return, that the verdict was against the direction of the court in matter of law. Keeping in view the doctrine before stated by him in the extract before given, (*ante*, 289, 290,) that though the jury answer not singly to the question, What is the law? yet they determine the law in all matters where issue is joined, resolve both law and fact complicately, and not the fact by itself, we can understand, I think, more exactly, the sense and effect of his argument. " The words, ' that the jury did acquit against the direction of the court in matter of law,' literally taken,

25*

and *de plano*, are insignificant, and not intelligible ; for no issue can be joined of matter in law, no jury can be charged with the trial of matter in law barely, no evidence ever was or can be given to a jury of what is law or not; nor no such oath can be given to or taken by a jury, to try matter in law ; nor no attaint can lie for such a false oath." Vaugh. 143. Certainly, no issue of pure law is ever submitted to the jury—" matter in law barely." They answer not singly to what is the law. No issue can be joined of matter in law. No oath can be given to try matter in law. No evidence can be offered upon it.

" Therefore," the Lord Chief Justice proceeds, " we must take off this veil and color of words, which make a show of being something, and in truth are nothing." What are the words which make a show of being something, and in truth are nothing? " *Contra directionem curiæ in materia legis acquietaverunt :* " Acquitted against the direction of the court in matter of law.

" If the meaning of these words, ' finding against the direction of the court in matter of law' be, that if the judge, having heard the evidence given in court, (for he knows no other,) shall tell the jury, upon this evidence the law is for the plaintiff, or for the defendant, and you are, under the pain of fine and imprisonment, to find accordingly, then the jury ought of duty to do so ; every man sees that the jury is but a troublesome delay, great charge, and of no use in determining right and wrong, and therefore the trials by them may better be abolished than continued ; which were a strange, new found, conclusion, after a tria. so celebrated for so many hundreds of years." Vaugh. 143.

The reasoning is this : The return, that the jury acquitted against the direction of the court in matter of law, is senseless. They could not try an issue of law, but of fact complicated with law ; and if, upon such an issue, the court could tell the jury, upon this evidence the law is for the plaintiff or defendant, the trial by jury would be useless.

This view is confirmed by a subsequent passage, in which he says : " Without a fact agreed, it is impossible for a judge, or any other, to know the law relating to that fact, or direct concerning it, as to know an accident that hath no subject." Vaugh. 147.

There are passages in this judgment which, taken from their context, might possibly lead to a different result; but, for the general scope and effect, I with confidence refer to the whole case.

This view is strengthened by Sir Thomas Jones's report. " The jury are perjured if the verdict be against their own judgment, though by direction of the court; for their oath obliges them to their own judgment." Referring to a case cited, it says: " The fine there was for a misdemeanor of a jury, not for their verdict, which is a judicial act." *Bushel's case,* T. Jon. 17.

I have cited the opinion of Lord Somers in 1681. Seven years after occurred the most important trial in English history, upon the decision of which the liberties of the kingdom turned, the trial of the Seven Bishops. It was for a seditious libel against the king and his government, contained in their petition to James II, praying that his majesty would be pleased not to insist upon their distributing and reading, in the churches, the king's dispensation of the law, and the declaration as to liberty of conscience. The case was tried before the four judges of the king's bench. The whole cause, law and fact, was submitted to the jury, each judge expressing his opinion of the law.

Lord Chief Justice Wright said : " The only question before me is, and so it is before you, gentlemen, it being a question of fact, Whether here be certain proof of publication ? And then the next question is a question of law indeed, Whether, if there be a publication proved, it is a libel ? " " Now, gentlemen, any thing that shall disturb the government, or make mischief and a stir among the people, is certainly within the case of *Libellis Famosis;* and I must in short give you my opinion, I do take it to be a libel. Now this being a point of law, if my brothers have any thing to say to it, I suppose they will deliver their opinions."

Mr. Justice Holloway said: " If you are satisfied there was an ill intention of sedition, or the like, you ought to find them guilty; but if there be nothing in the case that you find, but only that they did deliver a petition to save themselves harm-

less," &c., " I cannot think it is a libel; it is left to you, gentlemen ; but that is my opinion."

Mr. Justice Powell said : " Truly I cannot see, for my part, any thing of sedition, or any other crime, fixed upon these reverend fathers, my lords the bishops. For, gentlemen, to make it a libel, it must be false, it must be malicious, and it must tend to sedition," &c. " I leave the issue to God and your consciences."

Mr. Justice Allibone gave his opinion, in substance, that it was a libel.

The whole question of libel was submitted to the jury ; two judges expressing the opinion that it was a libel, one that it was not, a fourth that it was a question of intent. 12 Howell's State Trials, 425–428. How was the cause to be determined, law and fact, but by the jury ? How in conformity to the direction of the court ?

It was but four years after this case, that William and Mary granted to all their subjects of the Province of the Massachusetts Bay to " have and enjoy all liberties and immunities of free and natural subjects within any of the dominions of us, our heirs and successors, to all intents, constructions and purposes whatsoever, as if they and every of them were born within this our realm of England." Anc. Chart. 31.

One would have supposed that the *case of the Seven Bishops* would, for the life of that generation at least, have settled the law. But only sixteen years later commenced an earnest effort on the part of the judges, especially in cases of libel, to modify, if not entirely change the rule. To this effort I will briefly advert.

In *Tutchin's case,* tried before a single judge, Lord C. J. Holt, in 1704, in the conclusion of the charge, that eminent judge said to the jury : " Gentlemen, I must leave it to you ; if you are satisfied that he is guilty of composing and publishing these papers at London, you are to find him guilty." It is to be observed however that, before this, he had discussed with the jury the question whether libel or not. " Now you are to consider, whether these words I have read to you do not tend to

beget an ill opinion of the administration of the government. To tell us, that those that are employed know nothing of the matter, and that those that do know are not employed; men are not adapted to offices, but offices to men, out of a particular regard to their interest, and not to their fitness for these places; this is the purport of these papers." 14 State Trials, 1128, 1129.

Twenty seven years later an advance step is made. In *Francklin's case*, in 1731, also before a single judge, Lord C. J. Raymond, the jury were told that, " whether these defamatory expressions amount to a libel or not does not belong to the office of the jury, but to the office of the court, because it is a matter of law and not of fact, and of which the court are the only proper judges." In the conclusion of his charge the Lord Chief Justice said : " So, gentlemen, if you are sensible and convinced that the defendant published that Craftsman of the 2d of January last, and that the defamatory expressions in the letter refer to the ministers of Great Britain, then you ought to find the defendant guilty." 17 State Trials, 672, 675.

These cases, determined by single judges, having as prece- dents really no force, and which, as matter of reason and good sense, will not bear a moment's scrutiny, will be found referred to in the books as leading authorities against the right of the jury.

The case of *The King* v. *Oneby*, 17 State Trials, 29, and 2 Ld. Raym. 1485, is not of much greater weight. Oneby was in- dicted for murder. The jury found a special verdict, praying the judgment of the court whether the facts found showed murder or manslaughter. The court held that the offence was murder. They held also that the courts were judges of the mal- ice, and not the jury; that the question of malice was a question of law. Upon the special verdict, it is obvious, no question could be raised but one of law. No question was opened as to the respective provinces of the court and jury. The jury had, by finding the facts specially, submitted the question of law to the court. But this, as the other cases cited to sustain the ex clusive power of the court in the decision of the law in crim- inal causes, is worthy of careful study, as illustrating to what extremes the doctrine has been carried where it has once been assumed.

The authority of Lord Hardwicke has been much relied upon in discussions of this question. The opinions of Lord Hardwicke, on questions not affecting the liberty of the subject, command the highest respect. But he was, as Mr. Hallam well observes, " a regularly bred crown lawyer, and in his whole life disposed to hold very high the authority of government." 3 Hallam's Const. Hist. (9th ed.) 287.

Beyond this, the words of every judge must be construed with reference to the subject matter, and the occasion on which they are used. This is a familiar rule of interpretation. The case of *The King* v. *Poole,* Cas. temp. Hardw. 23, was an information in the nature of a *quo warranto,* to show cause by what authority the defendant acted as mayor of Liverpool. Though it has some of the forms of a criminal, it is, in all its essential principles, a civil cause. Upon this point, the case of *The King* v. *Francis,* 2 T. R. 484, is quite conclusive. There, a verdict having been found for the defendant on a *quo warranto* information, to show by what authority he claimed the office of alderman of Cambridge, a new trial was moved for, on the ground that the verdict was against the weight of evidence; and the court granted a new trial, upon the ground that a *quo warranto* information was merely in the nature of a civil proceeding. So the case of *The King* v. *Poole* was treated by the court. The judge directed the jury to find a special verdict, which he might not do in a criminal cause. The questions settled are matters of civil right. The remarks therefore of Lord Hardwicke, regarded as made in a civil cause, and with reference to the subject matters involved in it, speak the well established law, but are not evidence of the rule in criminal cases.

Between the Revolution of 1688 and the time of our separation, the other cases usually cited are cases of libels; and even those at *nisi prius,* cases which have been declared not to have been the law of England, and which hold a doctrine which has never been adopted, nor in any way sanctioned in this commonwealth. I refer to *The King* v. *Clarke,* in 1729, 17 State Trials, 667, *note,* before Lord Raymond, who said the fact of printing and publishing was the only issue to the jury to *Owen's case,*

in 1752, 18 State Trials, 1203, before Lord Chief Justice Lee ;
to *Nutt's case,* before Lord Chief Justice Ryder, in 1756 ; to *Sheb-
beare's case,* before Lord Mansfield, in the same year; to *Wood-
fall's case,* before Lord Mansfield, in 1770; in all which the
same rule was laid down.   3 T. R. 430, *note.*   5 Bur. 2661.

After the separation came the *case of the Dean of St. Asaph,*
in 1784, 3 T. R. 428, *note; Stockdale's case,* 22 State Trials, 237,
and *The King* v. *Withers,* 3 T. R. 428, in 1789, followed by *St.*
32 G. 3, *c.* 60, which reaffirmed and reinstated the common law
of England.  See remarks of Lord Campbell in 6 Lives of the
Chancellors, 435.

I do not esteem the controversy in relation to the law of libel
in England as having great weight upon the question before
us; because the great contest took place and was settled after
our separation, and because the doctrine of Mr. Justice Buller
and Lord Mansfield has never been the law of this common-
wealth.

With respect however to the cases of libel, one or two sug-
gestions should be made.   It is not difficult to see how the
controverted question arose.   Though the jury had the power
of determining the law and fact involved in the general issue,
yet, upon facts found by special verdict, or agreed upon, the
question was one of law on the record for the court.   An in-
dictment for libel sets forth, upon the record, the very words of
the libel itself.

If therefore it was found, by the verdict of the jury, or agree-
ment of parties, that the defendant published the writing alleged
to be a libel, with the application charged in the indictment, the
question whether it was libellous or not was, it was said, a ques-
tion of law on the record.   If the matter was libellous, the law
inferred the malice.   This was the view of Lord Mansfield in
the *case of the Dean of St. Asaph.*   He tells us that, in the *case
of Shebbeare,* his direction to the jury was, and had been uni-
formly since, that if the jury were satisfied of the publication
and that the meaning and innuendoes were as stated, they
ought to find the defendant guilty, leaving the question of law
upon the record for the judgment of the court.   Again, even

more emphatically: " Where the questions can be severed by the form of the pleadings, the distinction is preserved upon the face of the record, and the jury cannot encroach upon the jurisdic tion of the court." 3 T. R. 430, 431, *note.*

However therefore it might be as a question of public policy, affecting the freedom of the press; as matter of strict law, if the law in criminal cases was the exclusive province of the court, no class of cases fell so clearly within that province, as libels spread upon the record, and found to be published by the defendant, with the application charged. Whether libellous or not, whether criminal or not, was a question of law. The malice is a legal inference from the acts done. *Commonwealth* v *Blanding*, 3 Pick. 304.

Such is the answer of the twelve judges to the question put to them by the house of lords in 1792. The question was, " On the trial of an information or indictment for a libel, is the criminality or innocence of the paper set forth in such information or indictment, as the libel, matter of fact or matter of law? " To this the judges replied: " That the criminality or innocence of any act done (which includes any paper written) is the result of the judgment which the law pronounces upon that act, and must therefore be, in all cases and under all circumstances, matter of law, and not matter of fact." 22 State Trials, 296, 298.

So in *Rex* v. *Burdett*, 4 B. & Ald. 131, Mr. Justice Best says : " It must not be supposed the statute of George III made the question of libel a question of fact. If it had, instead of removing an anomaly, it would have created one. Libel is a question of law, and the judge is the judge of the law in libel, as in all other cases, the jury having the power of acting agreeably to his statement of the law, or not." Again he says: " In all cases the jury may find a general verdict; they do in cases of murder and treason, but there the judge tells them what is the law, though they may find against him, unless they are satisfied with his opinion."

Whether the publication was a libel or not was then a question of law, but it was also a question for the jury. And upon

this ground the question was, I believe, raised and settled. I refer to the judgment of Lord Mansfield in the *case of the Dean of St. Asaph*, 3 T. R. 428, *note*, and the argument of Mr. Erskine on an application for a new trial in that cause before the king's bench, 21 State Trials, 971, which Charles James Fox declared to be the finest piece of reasoning in the English language, as quite conclusive upon the subject. Wynne, who in his Eunomus advocates the exclusive power of the court in matters of law, says they have the same exclusive power in libels. To use his own words : " The least reflection will be sufficient to show that the power and province of juries is the same in case of libels as in every other criminal case." 3 Eunomus, 237, 238.

It is worthy of remark that, in the leading case in our own country, upon the subject of the province of the jury in cases of libels, the right of the jury is vindicated, not only upon grounds peculiar to libels, but also still more emphatically upon the general power of the jury in criminal cases to decide the law involved in the general issue. See the argument of Alexander Hamilton and the opinion of Mr. Justice Kent in the *case of the People* v. *Croswell, ubi supra.*

In conclusion, the result of a careful examination of the authorities will, I think, be found to be, that the right of the jury to decide, in criminal cases, the whole issue of law and fact by a general verdict was well settled in England at the Revolution of 1688. There was little to disturb it, unless we give judicial force to such cases as *Throckmorton's, Lilburne's, Penn & Mead's* and *Algernon Sydney's* ; cases which are not only the reproach of jurisprudence, but of human nature itself. Yet these decisions, it is painful to reflect, the doctrines of which have been repudiated and their authors held in abhorrence, have found their way. into text books, and, transferred from one to another without consideration, have finally come to influence wise and good men, and to be sometimes even the basis of judicial decision and the invisible foundation of law.

From the Revolution of 1688 to the time of our separation, nothing like a line of respectable precedents can be found to change the doctrine as then settled. The cases in which the

struggle was made, (principally cases of libel,) as precedents, as judicial decisions, have no longer any force; and the remarks in them, as to the general power and right of juries, have no other weight but that which belongs to the individual opinions of the judges who uttered them.

I have dwelt longer than I had intended upon this portion of the argument. For the question before us is not, I repeat, what was the rule in England at the time of the separation? but what was the right of the jury under the law " adopted, used and approved in the Province, Colony or State of Massachusetts Bay"? Upon that question, in the light of our legislation, the practice and usages of our courts and our judicial decisions, I can entertain no serious doubt. That was the right which the Constitution was intended to secure. That, in my judgment, is the right which this statute declares and affirms.

Such being the conclusions to which, upon a careful consideration of the subject, my mind has been brought, it has seemed to me an obvious duty to state, however imperfectly, the grounds of my dissent from the opinion of the court. Though I must distrust my own judgment when it differs from those, to whom, if my sense of duty permitted, I should so readily defer, I cannot but feel that, if I err in these views, I err with the fathers; that I am in the old and beaten path, standing *super antiquas vias.*

I bring this opinion to a close by stating its results.

They are, that, by the common law, as used and "practised on" in the Colony, Province and Commonwealth, the jury, in criminal causes, had, with the limitations hereafter expressed, the rightful power to decide, by a general verdict, all questions of law and fact involved in the general issue;

That, in so deciding, their office is judicial, and they are bound to adhere to the established principles of law;

That the instructions of the court are the usual evidence of what are the established principles of law; but that the jury may so far depart from those instructions as to acquit the prisoner, if they are satisfied, either that there is no such law as that which the defendant is charged with violating, or that the facts proved do not show such violation;

Commonwealth *v.* Anthes.

That, under the settled usage and practice in this common-wealth, the accused is always entitled to the benefit of the instructions of the court, in matter of law, favorable to his cause, and that the jury cannot, against such instructions, con-vict him;

That the *St.* of 1855, *c.* 152, but declares and affirms the common law, as theretofore, and until a recent period, used and " practised on " in the Commonwealth;

That if the statute of 1855 has, in favor of the liberty of the subject, enlarged the power of the jury in criminal cases, it conflicts with no provision of the Declaration of Rights or Frame of Government;

That, in either view, the statute is a constitutional and valid act. *Exceptions sustained.*

NOTE. Many cases of convictions in the court of common pleas for similar offences, pending before this court in different counties, were decided at the same time, only three or four of which need be stated.

In the case of COMMONWEALTH *vs.* JOHN MARTIN, which was a complaint on *St.* 1855, *c.* 215, § 17, for being a common seller, tried in Essex, October term 1855, *Briggs,* J. signed the following bill of exceptions: " The defendant proposed to argue to the jury that no offence was charged against him in the complaint, under the 12th article of the Declaration of Rights. The court ruled, that whether any offence was charged upon the defendant or not, or whether it was sufficiently set forth, was a question for the court and not for the jury, and that it could not be properly argued to the jury. The presiding judge instructed the jury that, by a law passed by the last legislature, they had a right, after receiving the instructions of the court, at their discretion, to decide both the law and the facts involved in the issue before them, or to render a special ver-dict; but that law, like all others, when it came to be acted on, must receive a judicial construction, and must have some limitations. He therefore instructed the jury that, if the question now before them, which was the constitutionality of the fifteenth section of the liquor law of the last session of the legislature, had been before the supreme court of the Commonwealth, and they had decided that it was constitutional and valid, the jury had no right to revise or disregard that decision, but were bound by it; in such a case it was the settled law of the Commonwealth, binding upon all the citizens and officers of the Commonwealth, until altered, modified or repealed by the legislature; if it was not so, then we had no criminal law in Massachusetts any farther than it should be settled by a jury in and for each case as it should come before them. The defendant agreed, for the purposes of this trial, that the supreme court had decided that the 15th section of the liquor law of the last session is constitutional and valid.

To all of which the defendant excepts." These exceptions were argued at November term 1855, by *D. Saunders, Jr.* for the defendant, and *J. H. Clifford*, (Attorney General,) for the Commonwealth, and overruled; DEWEY and THOMAS, JJ. dissenting.

The following three cases came before the court at Northampton at September term 1856, on exceptions to the rulings of the same judge in Hampden, December term 1855. In the case of COMMONWEALTH *vs.* ELLEN DOWNING, for keeping intoxicating liquor with intent to sell, contrary to *St.* 1855, *c.* 215, § 24, the defendant requested that the jury might be instructed " that they had not the right to decide, ultimately and authoritatively, the law according to their judgment and discretion, but were to take the law from the court, and apply it to the facts; and that the jury had not the right to decide the law involved in the case, contrary to the instructions of the court." But the judge refused so to instruct the jury; and instructed them " that they were to try the case according to established forms and principles of law, and, after receiving the instructions of the court, they had the right to decide at their discretion, by a general verdict, both the law and the fact involved in the issue, or to find a special verdict at their election." In the case of COMMONWEALTH *vs.* WILLIAM COOLEY, for an unlawful sale of intoxicating liquor, in violation of *St.* 1855, *c.* 215, § 15, the judge was requested by the defendant to instruct the jury " that the *St.* of 1855, *c.* 152, was unconstitutional and void; and, if constitutional, gave the jurors no legal right or authority to judge of the law at their discretion, in the trial of the case." But the judge refused so to instruct the jury; and instructed them " that this statute was constitutional, and gave the jury a legal right and authority to judge of the law involved in the issue, as well as of the fact, or to return a special verdict at their discretion." In the case of COMMONWEALTH *vs.* ELLEN O'BRIEN, for a like offence, the judge instructed the jury " that under the *St.* of 1855, *c.* 152, it was their duty to decide at their discretion, by a general verdict, both the fact and the law involved in the issue; or that they might find a special verdict, finding the facts, and leaving the law to be determined by the court;" and declined to instruct them that said act was unconstitutional and void. The exceptions in these three cases were argued by *G. M. Stearns*, for Cooley and Downing, and *W. L. Smith*, for O'Brien, and *J. H. Clifford*, (Attorney General,) for the Commonwealth, and sustained; the same majority of the court being of opinion, for the reasons given in the principal case, that the jury had no rightful power, before or since the *St.* of 1855, *c.* 152, to decide the law involved in the issue, contrary to the instructions of the court; and that the instructions given, and the refusal to give those asked for, tended to mislead the jury in this respect.